## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DANIEL J. SAVAGE** | : |
| | : |
| **Plaintiff,** | : |
| **v.** | : **2:15-CV-6501** |
| | : **(JUDGE MARIANI)** |
| **PENNSYLVANIA TURNPIKE** | : |
| **COMMISSION** | : |
| | : |
| **Defendant.** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is the Motion of Defendant Pennsylvania Turnpike

Commission (Doc. 8) to Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6), and in the alternative, to dismiss Count III insofar as it seeks money

damages for lack of subject matter jurisdiction under Federal Rule of Civil Procedure

12(b)(1).

In December 2015, Plaintiff Daniel Savage filed the above-captioned matter against

his former employer, the Pennsylvania Turnpike Commission (Doc. 1).  Plaintiff's three-

count Complaint alleges violations by Defendant of Plaintiff's Constitutional right to free

speech and free association pursuant to 42 U.S.C. § 1983 and the Pennsylvania

Constitution.

The Turnpike Commission moved to dismiss the Complaint on February 12, 2016

(Doc. 8). Upon the request of both parties (Docs. 17, 18), the Court held oral argument on

Defendant's motion on June 3, 2016.

The parties have fully briefed and argued the motion, and it is now ripe for decision.

For the reasons that follow, the Court will deny Defendant's motion.

## II. FACTUAL ALLEGATIONS

Plaintiff's Complaint (Doc. 1) alleges the following well-pleaded facts, which are

accepted as true for purposes of resolving the current motion.

Plaintiff, Daniel J. Savage, is a resident of Philadelphia, Pennsylvania (Doc. 1, ¶ 8).

The defendant, Pennsylvania Turnpike Commission, is an independent agency created to

construct, finance, operate, and maintain the Pennsylvania Turnpike, James E. Ross

Highway, Amos K. Hutchinson Bypass, Mon/Fayette Expressway and Pittsburgh's Southern

Beltway. (*Id.* at ¶ 9). At all relevant times, the Turnpike Commission was acting pursuant to

authority granted pursuant to state statute and was acting under the color of state law. (*Id.*

at ¶ 10).

Savage was employed by the Turnpike Commission from August, 2003 through

November, 2006 when he resigned to serve as a Philadelphia City Councilperson. His

resignation was the result of the Commission Code of Conduct that restricted employees

from holding public office. (*Id.* at ¶ 11). After leaving his public office in October, 2008,

Savage was re-employed by the Turnpike Commission as the Regional Office Coordinator

of the Commission's Eastern Regional office. This position included only non-policy making

responsibilities and was not governed by the Civil Service regulations of the Commonwealth

of Pennsylvania. (*Id.* at ¶ 12). When Savage accepted this position, he was required to

sign a copy of the Pennsylvania Turnpike Commission Policy and Procedure Code of

Conduct ("Code of Conduct"), approved and effective in October 2007. (*Id.* at ¶ 13). In

relevant part, the Code of Conduct prohibited any "Member or Executive-Level Employee[1]"

from being a "Public official or Party Officer in the Commonwealth of Pennsylvania." (Code

of Conduct, Doc. 5, Ex. A, § IX). The Code of Conduct did not impose any prohibition on

running or announcing candidacy for political office. (Doc. 1, ¶ 14).

In approximately July of 2013, Savage announced his intention to seek the

Democratic Party nomination for State Senator for the Pennsylvania Second Senatorial

District, a seat held by Christine Tartaglione. Savage began raising money for his election

campaign through publicized fundraising events that were known to the politically appointed

leadership of the Turnpike Commission who allegedly favored the candidacy of Senator

Tartaglione. (*Id.* at ¶ 15).

On January 7, 2014, the Turnpike Commission revised its Code of Conduct. In

relevant part, the Turnpike Commission added the following provision:

> No Executive-Level Employee or Employee shall be a candidate for
> nomination or election to any State or Federal Office unless he or she shall

---

[1] Although the terms "Member" and "Executive-Level Employee" are defined in Sections 3.7 and 3.14 of the Code of Conduct, it is unclear whether either of these terms applied to Plaintiff's position or, instead, if Plaintiff was an "Employee" within the definition of Section 3.8 of the Code of Conduct.

have first resigned from his or her employment with the Commission. State Office shall be deemed to include the following offices in the Commonwealth of Pennsylvania: Governor, Lieutenant Governor, Attorney General, Auditor General, State Treasurer, Senator and Representative in the General Assembly . . . .

(Code of Conduct, Revised January 7, 2014, at § 9.3).

On March 10, 2014, in an attempt to avoid an issue that his candidacy would interfere with his work for the Turnpike Commission, Plaintiff requested a 45 day leave of absence. (Doc. 1, ¶ 16). Three days later, Patricia Schlegel, the Turnpike Commission's Director of Human Resources, responded to Savage's request and made him aware of the change in the Turnpike Commission's policies. (*Id*. at ¶ 18). In relevant part, Schlegel's letter stated the following:

On January 7, 2014, the Commission approved revisions to Policy Letter 3.10 (Code of Conduct), which, among other things, prohibit employees from being a candidate for nomination or election to any State or Federal Office unless he or she resigns from Commission employment. Robert Brady specifically informed you of the policy changes and advised that they would be applicable to you should you choose to run for State office.

. . . .

Therefore, should you decide to remain a candidate for Senate, you must resign your position within ten (10) days of the date of this letter or your employment with the Commission will be terminated.

(March 13, 2014, Letter from Patricia Schlegel, Doc. 5, Ex. C). Schlegel's letter also asserted that "the fact that revisions to a Policy Letter have not been updated on the Turnpike Intranet does not affect its validity." (*Id*.).

4

At no time prior to Savage's request for a leave of absence was he told that being a candidate for a public office would violate any employee mandate and before receiving Schlegel's letter he was not aware of any employment provision that prevented an employee from being a candidate for public office. (Doc. 1, ¶¶ 17, 19).

On March 20, 2014, Savage responded to Schlegel's letter, "wherein he complained that (a) the unpublished policy was not properly implemented, and accordingly not enforceable, and (b) in any case the alleged rule constituted an unconstitutional constraint on his rights of free speech and association." (*Id.* at ¶ 22; March 20, 2014, Letter from Savage, Doc. 5, Ex. D).

On March 24, 2014, Schlegel advised Savage that his employment with the Turnpike Commission was terminated effective March 25, 2014 because he had "not complied with the directions set forth in the Commission's March 13, 2014 correspondence to you regarding your candidacy for elected office." (March 24, 2014, Letter from Schlegel, Doc. 5, Ex. E).

The Revised Code of Conduct which contained the provision preventing employees from running for office was not published to Turnpike Commission employees until June, 2014. (Doc. 1, ¶ 24).

As a result of the aforementioned allegations, Plaintiff alleges that "[t]he averred amendment Code of Conduct was imposed specifically to prevent Plaintiff from pursuing the

5

Democratic Party nomination for the State Senate seat held by incumbent Christina

Tartaglione and/or to retaliate against him for doing so." (*Id.*at ¶ 25).

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it

does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement

to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of

action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations

omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above

the speculative level." *Id.* A court "take[s] as true all the factual allegations in the Complaint

and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal

conclusions and threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231

n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a court] to take the following three steps to
> determine the sufficiency of a complaint: First, the court must take note of the

elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## IV. ANALYSIS

The Plaintiff sets forth three counts in his Complaint: Count I entitled "42 U.S.C. § 1983 (Violation of Plaintiff's Constitutional Right of Free Speech)", Count II entitled "42 U.S.C. § 1983 (Violation of Plaintiff's Constitutional Right of Free Association)", and Count III, entitled "Pennsylvania Constitution (Violation of Plaintiff's Constitutional Rights of Free Speech and Association)". (*See* Doc. 1). Each of these counts alleges that the Turnpike Commission violated the Plaintiff's constitutional rights by, *inter alia*, "promulgating an amendment to the Commission Code of Conduct specifically for the purpose of preventing him from running for State Senate against the incumbent, Christine Tartaglione, and/or in retaliation for his decision to run for State Senate against the incumbent, Christine Tartaglione," as well as by failing to inform Plaintiff of the amendment to the Commission

7

Code of Conduct prior to enforcing it against him and by threatening to terminate, and then terminating, his employment for violating what Plaintiff describes as "the unpublished amendment to the Code of Conduct." (Doc. 1, ¶¶ 31, 35, 39). Further, the Plaintiff characterizes these allegations in Count II of his Complaint as "constitut[ing] a denial of free association in violation of the Fourteenth Amendment in the United States Constitution and 42 U.S.C. § 1983." (*Id.* at ¶ 36).

Challenges by public employees to restrictions or outright prohibitions on becoming a candidate for or holding elective office, or engaging in other forms of political activity having to do with the electoral process, are not new. Such restrictions or prohibitions have almost uniformly been upheld, essentially on the basis that partisan political activities by public employees, including becoming a candidate for elective office, are incompatible with the principles of honest and efficient government.

The Seventh Circuit's statement, in upholding an Indiana law prohibiting persons from simultaneously holding elected office while employed as civil servants in that same Government unit, supports the above conclusion:

> We agree with defendants that the Indiana Law falls squarely within the bounds of settled Supreme Court precedent upholding restrictions on the political activity of state employees. *See Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (upholding the constitutionality of provisions of the Texas Constitution restricting the political activity of state employees, including by prohibiting a sitting judge from serving on the state legislature); *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (holding that Oklahoma may regulate the political activities of its state employees); *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (reaffirming *United Pub.*

8

*Workers of Am. v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), which held that the Hatch Act's restrictions on a broad range of political activities by federal employees was constitutionally permissible). In fact, the Supreme Court has repeatedly upheld the constitutionality of "resign-to-run" laws, which forbid public employees from running for elected office. *Clements*, 457 U.S. at 971–72, 102 S.Ct. 2836; *Broadrick*, 413 U.S. at 616–17, 93 S.Ct. 2908; *Letter Carriers*, 413 U.S. at 556, 93 S.Ct. 2880.

*Claussen v. Pence*, --- F.3d ---, 2016 WL 3213036 (7th Cir. 2016). Under this rationale,

public employers must be shielded from the improper influences or conflicts of interest that

arise when a public employee with responsibilities for the administration of public services

must also gain the favor of one or more constituencies in order to gain victory in a contested

and typically fractious election.

The leading case continues to be *United States Civil Service Commission v. National Association of Letter Carriers, AFL-CIO,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). There, the Supreme Court, reaffirming its prior decision in *United Public Workers of America v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), upheld the "Hatch Act", 5 U.S.C. § 7324, which prohibits federal employees from taking an active part in political management or in political campaigns and also prohibits a federal employee from becoming a "partisan candidate for, or campaigning for, an elective public office . . . ." *Letter Carriers*, 413 U.S. at 556. In so ruling the Court stated that "[o]ur judgment is that neither the First Amendment nor any other provision of the Constitution invalidates a law barring this kind of partisan political conduct by federal employees." *Id*.

The reasoning given by the Supreme Court in *Letter Carriers* is that "partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly [and] elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences." *Id.* at 564.

Previously the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), held that a "balancing test" must be applied in determining whether the Government's interest in promoting the efficiency of the public services it performs outweighs the right of an employee to exercise his First Amendment rights. In *Pickering*, the Court described the balancing issue as follows:

> The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

391 U.S. at 568.

In *Pickering* a teacher was fired by the School Board after he sent a letter to a local newspaper in connection with a recently proposed tax increase that was critical of the way in which the School Board and the School Superintendent had handled past proposals to raise tax revenue for the schools and which criticized the use of funds for athletic rather than academic activities.

The Supreme Court reversed the teacher's dismissal which had been upheld by the Illinois Supreme Court, stating:

10

In sum, we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment. Since no such showing has been made in this case regarding appellant's letter . . ., his dismissal for writing it cannot be upheld and the judgment of the Illinois Supreme Court must, accordingly, be reversed and the case remanded for further proceedings not inconsistent with this opinion.

391 U.S. at 574-575.

Along with its decisions in *Pickering* and *Letter Carriers, supra,* the Supreme Court in *Broadrick v. Oklahoma*, upheld an Oklahoma statute which mirrored the Federal Hatch Act which applied to employees in Oklahoma in the "classified service" and which prohibited, *inter alia*, being a "candidate for nomination or election to any paid public office . . . ." 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

The cases applying *Mitchell*, *Letter Carriers*, *Broadrick* and *Pickering* have almost uniformly upheld rules requiring a public employee to resign in order to run for political office. The rules requiring a public employee to resign in order to run for political office have been directed at judges, assistant district attorneys who were running for judge, probation officers, police chiefs, Pennsylvania State Police members and court personnel. Most recently, in *Phillips v. City of Dallas*, 781 F.3d 772 (5th Cir. 2015) and *Claussen, supra,* the restrictions were imposed upon a firefighter (*Phillips*) and upon municipal police officers, an office manager of a municipal water works, and a firefighter (*Claussen*).

The following cases warrant brief discussion to gain a full perspective on the manner in which the Supreme Court's decision in the cases cited above have been applied.

11

In *Commonwealth v. Moak*, 307 A.2d 884 (1973), assistant district attorneys, who were city employees of Philadelphia, and, therefore, subject to the Philadelphia City Charter requirement that employees resign before becoming a candidate for public office, became candidates for judgeships without having resigned. The Pennsylvania Supreme Court upheld the right of the City to withhold their pay when they refused to resign. The Court, quoting *Pickering,* first noted that "the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Moak,* 307 A.2d at 887 (quoting *Pickering*, 391 U.S. at 568).

But the Court in *Moak* also noted that "the United States Supreme Court has specifically recognized that the State does have certain interests, as an employer, in regulating the activity of its employees." *Id*. at 888. Again quoting *Pickering*, the Court reiterated "[t]he problem in any case is to arrive at a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering*, 391 U.S. at 568) (internal brackets omitted).

The Court in *Moak* stated that the "governmental unit has the burden of showing that the restriction on the First Amendment activity is the least drastic means for achieving the governmental purpose." 307 A.2d at 889 (citing *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) ("[governmental] purpose cannot be pursued by means that

broadly stifle fundamental personal liberties when the end can be more narrowly

achieved.")).

Accordingly, the Pennsylvania Supreme Court held that the

prohibition on political candidacy in Section 10-107(5) is a constitutionally
permissible restriction on the political activity of Philadelphia's officers and
employees. While the test employed in *Mitchell* may not be all inclusive, the
principle it announced is very much alive today.
"The evident purpose of congress in all this class of enactments has been to
promote efficiency and integrity in the discharge of official duties, and to
maintain proper discipline in the public service." [*Mitchell*, 330 U.S. at 96-97]."

*Moak*, 307 A.2d at 889. The Court then concluded that

the City of Philadelphia has a compelling governmental interest which justifies
requiring City officers and employees to resign before becoming a candidate
for nomination or election for any public office. The reason – as stated in the
Annotation to Section 10-107(5) – for imposing this requirement is 'because
an officer or employee who is a candidate for elective office is in a position to
influence unduly and to intimidate employees under his supervision and
because he may neglect his official duties in the interests of his candidacy."

*Id.*

In *Morial v. Judiciary Commission of the State of Louisiana*, 565 F.2d 295 (5th Cir.

1977), Louisiana had a rule requiring that judges resign from their offices prior to becoming

candidates for non-judicial office. The rule was upheld under *Letter Carriers, supra,* and

*Broadrick, supra.* The Fifth Circuit noted that the Supreme Court's decision in *Letter Carriers*

held that "Congress could constitutionally restrict political activity by subordinate employees

in order to prevent coercion by their superiors . . . ." 565 F.2d at 300.

13

The Fifth Circuit also indicated that, in its view, in light of *Letter Carriers, supra, Elrod v. Burns, et al.*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the First Amendment rights of public employees versus the rights of the public employer "can be reconciled only by concluding that the requisite closeness of the means-end relation must be determined on a case-by-case basis." *Morial,* 565 F.2d at 300. The Court in *Morial* stated that its view of *Letter Carriers* is that "restrictions on the partisan political activity of public employees and officers, where such activity contains substantial non-speech elements, (citations omitted), are constitutionally permissible if justified by a reasonable necessity . . . to burden those activities to achieve a compelling public objective." *Id.* (citations omitted).

The Court in *Morial* observed that "[c]andidacy for office is one of the ultimate forms of political expression in our society." *Id.* at 301. Thus, the Court said that it "should employ a level of scrutiny which requires the state to show a reasonable necessity for requiring judges to resign before becoming candidates for elective non-judicial office." *Id.* at 302.

The Court found that Louisiana's "resign-to-run" rule was reasonably necessary to effectuate the State's interest in "ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person." *Id.* Thus, it determined:

> The resign-to-run rule is reasonably necessary to the state's vindication of these interests. By requiring a judge to resign at the moment he becomes a candidate, the state insures that the judge will not be in a position to abuse his office during the campaign by using it to promote his candidacy. The appearance of abuse which might enshroud even an upright judge's decisions during the course of a hard-fought election campaign is also dissipated by

14

requiring the judge to resign. He who does not hold the powers of the office cannot abuse them or even be thought to abuse them.

*Id.* at 303.

The Court found also that it was even clearer that the resign-to-run rule was necessary for "the prevention of post-campaign abuse or its appearance" and rejected the assertion that a leave of absence would meet this requirement. *Id.*

In the years following the decision in *Morial*, district courts in this Circuit relied upon it to uphold "resign-to-run" rules, striking the balance between the public employee's First Amendment speech and associational rights and the public employer's interest in good government in favor of the public employer. *See e.g., Adams v. Supreme Court of Pennsylvania*, 502 F.Supp. 1282 (M.D. Pa. 1980) (summary judgment granted to the Supreme Court of Pennsylvania on a Pennsylvania district justice's suit challenging the Pennsylvania law which required him to resign his office when he became a candidate for Congress); *Giglio v. Supreme Court of Pennsylvania*, 675 F.Supp. 266 (M.D. Pa. 1987) (probation officer's suit to restrain the Pennsylvania Supreme Court from discharging him because he was seeking public office as a district judge dismissed on the basis that the prohibition against political activities by court-appointed employees was a permissible restriction of those employees' First Amendment rights); *Krisher v. Sharpe,* 763 F.Supp. 1313 (E.D. Pa. 1991) (dismissing suit by state trooper challenging the Pennsylvania State

Police regulation prohibiting State Police officers from running for political office)[2]. *See also,* *Naccarati v. Wilkins Twp.,* 846 F.Supp. 405, 410 (W.D. Pa. 1993) (Police chief for Township denied injunctive relief to prevent the Township from disciplining or firing him if he ran for public office; the District Court held that "[t]here is overwhelming support for the proposition that the government has an appropriate and substantial interest in proscribing certain political activities by public employees.").

The restriction on a public employee becoming a candidate for political office which requires the public employee's resignation was revisited by the Fifth Circuit in *Phillips v. City of Dallas, supra.* On this occasion, the restriction was not imposed upon members of the judiciary or law enforcement officers but, instead, upon a firefighter.

Phillips worked for the Dallas Fire Department as a fire dispatcher when he announced his candidacy for the Dallas County Commissioners' Court. He was then notified that he had violated the Dallas City Charter and the Dallas City Code of Ethics by failing to forfeit his positon with the City after he became a candidate for County Commissioner. He was thereafter discharged.

---

[2] In *Krisher,* a Pennsylvania state trooper challenged the Pennsylvania State Police regulation prohibiting State Police officers from running for political office. The District Court held that the limitation on the trooper's right to run for political office was outweighed by Pennsylvania's legitimate and substantial interest in preventing political abuse by troopers and safeguarding the appearance of propriety. The District Court rejected the Plaintiff's attempt to draw a distinction between a rule that would prohibit a trooper from holding political office while being employed as a state trooper with a rule which prohibits the trooper from running for office and rejected the Plaintiff's argument that the Defendant's regulation was unlawful "because it was not legislatively enacted," finding that "[r]egulations of this nature have been routinely upheld as valid exercise of authority"). *Krisher v. Sharpe,* 763 F.Supp. 1313, 1319-1320 (E.D. Pa. 1991).

16

The Court upheld the dismissal of Plaintiff's case which had been dismissed on the pleadings. In doing so, it began its analysis by stating that the test for balancing an employee's claimed speech interest against the Government's interests derives from *Pickering v. Board of Education, supra.* From there, the Court applied the decision in *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), stating that the employee must speak as a citizen on a matter of public concern and, if not, the employee has no First Amendment cause of action.  But if the employee has spoken on a matter of public concern, "the question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Phillips*, 781 F.3d at 776 (quoting *Lane v. Franks,* --- U.S. ---, 134 S.Ct. 2369, 2378, 189 L.Ed.2d 312 (2014)).

From there, the Court furthered its analysis by reference to the decisions in *United Mitchell, Letter Carriers,* and *Broadrick, supra.*

From these cases, the Fifth Circuit agreed with the District Court's holding that "'becoming a candidate for political office is within the First Amendment's ambit' and therefore constitutes speech on a matter of public concern." *Id.* at 778.

The Court observed that there is a First Amendment interest in candidacy. *Id.* (citing *United States v. Tonry,* 605 F.2d 144, 150 (5th Cir.1979) ("[t]here is no question that candidacy for office and participating in political activities are forms of expression protected

by the First Amendment.")).  The Court then held "that candidacy alone constitutes speech on a matter of public concern." *Id.* at 778-779.

On this premise, the Court then evaluated whether Phillips' interests in being a candidate were outweighed by those of the City. *Id.*

That is the threshold issue before the Court in this case – whether Savage's First Amendment interest in being a candidate for public office is outweighed by those of the Turnpike Commission.

The Court in *Phillips*, quoting *Morial*, stated that "[r]estrictions on the partisan political activity of public employees and officers are constitutionally permissible if justified by a reasonable necessity to burden those activities to achieve a compelling public objective." 781 F.3d at 779.

The Court of Appeals determined that the District Court had properly recognized the application of *Pickering* in its determination that "[t]he same interest that supported the federal law in *Letter Carriers* can certainly support these laws." *Id.* "Effectively, the district court concluded that *Letter Carriers* had *already* done the job of balancing the interests here and concluded that the government came out ahead. We agree." *Id.* at 779-780 (italics in original).

Phillips argued that the City could not simply rest on *Letter Carriers*, that it had to put forth specific reasons for how his particular candidacy has endangered the City's interests. The Court of Appeals responded: "We do not see why this must be so. In upholding the

18

Hatch Act in *Mitchell*, for example, the Court did not require any particularized

demonstration that the statute's interests were advanced in that specific case." *Id.*at 780.

Noting that the decision by the Supreme Court in *Letter Carriers* post-dated the

decision in *Pickering* ("the balancing test"), the Court stated:

> Having justified the City's use of the *Letter Carriers* interests to defend its
> Charter, we emphasize its holding. There, the Court saw no constitutional
> infirmity in a law that precluded federal government employees from a very
> broad range of political activity, including (among other political pursuits):
> raising money for, publicly endorsing, or campaigning for political candidates;
> serving as an officer of a political club; participating as a delegate in a political
> convention or running for office in a political party; and writing letters on
> political subjects to newspapers. But most significantly here, the Court held
> that a line-level postal worker could be precluded from becoming a partisan
> candidate for, or campaigning for, an elective public office.

*Id.* (internal citations and quotations marks omitted).  Accordingly, the Court in *Phillips*

offered: "It cannot be said that the Court left open the possibility of a successful as-applied

challenge to a rule like the City's: Phillips's sphere of permissible political activity dwarfs the

corresponding range afforded the mailmen in *Letter Carriers*." *Id.* at 780-781.

The Court found that Phillips' "as-applied challenge" fell short because "the

government had an 'adequate justification for treating [him] differently from any other

member of the public' based on the Government's needs as an employer." *Phillips*, 781

F.3d at 782.

The Court concluded with the following: "*Letter Carriers* and *Broadrick* remain good

law, and *Pickering* balancing in this circuit has time and time again favored governments

against First Amendment challenges to laws far more reaching than the City's here." *Id.* at

783. The Court put it simply, the "governmental interest in fair and effective operation of the government justifies regulation of partisan political activities of government employees." *Id.*

From this considerable body of case law, this Court concludes that the Turnpike Commission's January 7, 2014 amendment requiring an employee to resign his employment should he become a candidate for elective office would not, on its face, present a violation of the Plaintiff's First Amendment rights when justified by "reasonable necessity." This requirement stems from the Fifth Circuit's earlier decision in *Morial, supra*, which was not repudiated in the Fifth Circuit's much more recent ruling in *Phillips*. Thus, in *Morial*, the Court instructed that "we should employ a level of scrutiny which requires the state to show a reasonable necessity for requiring judges to resign before becoming candidates for elective non-judicial office." 565 F.2d at 302. Indeed, the Court in *Phillips* cited *Morial* approvingly and specifically made reference to *Morial's* text at pages 301-303 of that decision. 781 F.3d at 778.

To the extent that the Plaintiff argues that the Turnpike Commission must plead and prove the specific reasons why his particular candidacy sufficiently jeopardizes the Turnpike Commission's interest in good government to justify its January 7, 2014 amendment to its Code of Conduct prohibiting an employee from running for elective office, this Court finds the decision in *Phillips, supra*, to be persuasive.

The Court in *Phillips* found that the decision in *Letter Carriers, supra,* forecloses the possibility of a successful challenge such as that brought in this case by Plaintiff Savage,

i.e., an as-applied challenge to the amended Code of Conduct of the Turnpike Commission. Yet in doing so, the Court in *Phillips* did not abandon the requirement, originally set forth in *Morial*, that the employer show "reasonable necessity" for the restriction on its employees' free speech and free association rights with respect to becoming a candidate for elective office. "Reasonable necessity" does not appear to be a particularly heavy burden for the Turnpike Commission, but it is a requirement that it cannot establish through a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

Moreover, the Plaintiff's Complaint contains allegations that the rule requiring the resignation or termination of an employee who becomes a candidate for elective office was not the result of a proper balancing of the Plaintiff employee's First Amendment rights with the Turnpike Commission's interest in good government, but, instead, was enacted for a constitutionally impermissible purpose – to chill the Plaintiff's First Amendment rights and to retaliate against him for having exercised them.

Plaintiff's Complaint alleges that "[i]n or about July 2013, Plaintiff announced his intention to seek the Democratic Party nomination for the position of State Senator for the Pennsylvania Second Senatorial District, a seat that was, and continues to be, held by Christine Tartaglione, and began raising money for his election campaign through publicized fundraising events that were known to the politically appointed leadership of the Defendant who favored the candidacy of Senator Tartaglione." (Doc. 1, ¶ 15).

Plaintiff further alleges that he was made aware for the first time by letter dated March 13, 2014 from Commission Director of Human Resources, Patricia Schlegel, of an alleged change in the Turnpike Commission's policies. Ms. Schlegel's letter, Plaintiff alleges, stated that "[o]n January 7, 2014, the Turnpike Commission approved revisions to Policy Letter 3.10 (Code of Conduct) which, among other things, prohibit employees from being a candidate . . . unless he or she resigns from office." (*Id*. at ¶ 18). Plaintiff then alleges that the policy change had neither been updated on the Turnpike Commission's website or otherwise published to employees as required by (and was the practice regarding previous revisions to) the Code of Conduct but that Schlegel's letter to him nonetheless stated that "should you decide to remain a candidate for Senate, you must resign your position within ten (10) days of the date of this letter or your employment with the Commission will be terminated." (*Id*. at ¶ 20).

Plaintiff additionally alleges he sent a letter dated March 20, 2014 to Schlegel wherein he "complained that (a) the unpublished policy was not properly implemented, and accordingly not enforceable, and (b) in any case the alleged rule constituted an unconstitutional constraint on his rights of free speech and association." (*Id.*at ¶ 22). Plaintiff then alleges that four days later he received a letter from Schlegel which "advised that Plaintiff's employment with the Commission was terminated . . . ." (*Id.* at ¶ 23).

Finally, as previously noted, paragraph 25 of the Plaintiff's Complaint as well as paragraphs 31(a) and 35(a), all assert that the amendment to the Code of Conduct which

barred the Plaintiff from becoming a candidate for office was specifically promulgated "to prevent Plaintiff from pursuing the Democratic Party nomination for the State Senate seat held by incumbent Christine Tartaglione and/or to retaliate against him for doing so." (*Id.* at ¶¶ 25, 31(a)).

These allegations place Plaintiff's Complaint beyond dismissal at this stage. The allegations, taken as they must be as true for the purpose of determining the legal sufficiency of the Plaintiff's Complaint, show the Turnpike Commission's adoption of its January 7, 2014 amendment to its Code of Conduct and its retroactive application to the Plaintiff's July, 2013 candidacy to have a purpose entirely at odds with the objectives of the balancing test required by *Pickering, supra*, but also to be generated by a fundamentally illegal objective – to prevent a specific individual from seeking elective office for entirely politically partisan reasons and to retaliate against that individual for those same politically partisan reasons. These allegations hark back and are related to the patronage dismissals which the Supreme Court in *Elrod,* condemned as inconsistent with and violative of the First Amendment.

In *Elrod*, the Court began, with considerable prescience:

Although political patronage comprises a broad range of activities, we are here concerned only with the constitutionality of dismissing public employees for partisan reasons.

427 U.S. at 353. The Court condemned "patronage practice" in language that compels a determination that Plaintiff's allegations with respect to the adoption and retroactive

23

application by the Turnpike Commission of its rule requiring resignation of an employee who

seeks elective office be allowed to proceed:

> Under that practice, public employees hold their jobs on the condition that
> they provide, in some acceptable manner, support for the favored political
> party. The threat of dismissal for failure to provide that support
> unquestionably inhibits protected belief and association, and dismissal for
> failure to provide support only penalizes its exercise. The belief and
> association which government may not ordain directly are achieved by
> indirection.

*Id.* at 359.

Here, the Plaintiff has alleged in substance that his decision to challenge an

incumbent State Senator who he alleges is the favored candidate of the Turnpike

Commission's members is a failure to support that particular political faction as a result of

which he has suffered retaliation in the form of termination.[3]

Likewise, Plaintiff's allegations call into question whether the Turnpike Commission's

January 7, 2014 adoption of its rule prohibiting employees from running for public office has

any connection whatsoever with the objectives of good government which have historically

been the basis for the upholding of rules requiring an employee seeking office to "resign-to-

run". As the Supreme Court noted in *Elrod*:

---

[3] That the Plaintiff is a member of the same party as the incumbent Senator who he sought to
challenge, does not render this matter outside of the principles or holding *of Elrod*. As the Court noted in
*Curinga v. City of Clairton*, 357 F.3d 305 (3d Cir. 2004):

> Identical party affiliation does not necessarily ensure the subordinate's loyal adherence to
> the superior's policies. Primary election fights can be famously brutal, sometimes more so
> than contests in the general election, and animosity between candidates is likely to result.
> Recognizing this, other courts of appeals have broadened the definition of "political
> affiliation" to include commonality of political purpose, partisan activity, and political
> support.

357 F.3d at 311 (citations omitted).

24

The lack of any justification for patronage dismissals as a means of furthering government effectiveness and efficiency distinguishes this case from [Letter Carriers] and [Mitchell]. In both of those cases, legislative restraints on political management and campaigning by public employees were upheld despite their encroachment on First Amendment rights because, inter alia, they did serve in a necessary manner to foster and protect efficient and effective government.

427 U.S. at 366-467.

Here, if the allegations of Plaintiff's Complaint were substantiated, there would exist the same "lack of any justification" for Savage's dismissal as a "means of furthering government effectiveness and efficiency," Elrod, supra, that would distinguish this case from Letter Carriers and Mitchell.

To be sure, the Third Circuit has stated that "[a]lthough the result is likely to be the same under Elrod and Pickering, when an employee's speech is intermixed with political affiliation, the Pickering balancing standard is the better analysis to apply." Curinga v. City of Clairton, 357 F.3d 305, 313 (3d Cir. 2004). However, Curinga did not involve the enforcement of a rule restricting the right to run for public office which is at issue in this case. In Curinga, the City of Clairton fired Curinga after he campaigned against an incumbent City Council member who won re-election and against another successful Council candidate. The Court found that Curinga "cannot establish that his interest in speech outweighed the government's interest in efficiency." Id. at 313. Thus, Curinga on its facts is of limited value in the analysis of this case since the matter at issue here is the Turnpike Commission's termination of Savage allegedly in retaliation for his decision to run

25

against an incumbent State Senator. Unlike *Curinga*, this is not a case that involves open electioneering by the Plaintiff while he was still the City Manager in an effort to defeat certain City Council candidates to whom he was required to report after they won office over his opposition.

This Court's conclusion that Plaintiff has stated a cause of action under *Elrod* by his specific allegation that his termination was undertaken pursuant to a rule adopted by the Turnpike Commission to prevent him from challenging the incumbent State Senator and to retaliate against him when he did so is a claim based on an assertion of a constitutionally improper motive. The Supreme Court's recent decision in *Heffernan v. City of Paterson*, --- U.S. ---, 136 S.Ct. 1412 (2016), reaffirms that the assertion of a constitutionally impermissible motive for taking adverse action against a public employee because of that employee's political activity protected by the First Amendment, states a cause of action. In *Paterson*, the Court held that a city police officer who alleged he was demoted in retaliation for exercising his First Amendment rights, specifically supporting the challenger to the incumbent Mayor of Paterson, New Jersey, stated a cause of action under 42 U.S.C. § 1983 even though the officer's supervisors were mistaken about the officer's involvement in the challenger's mayoral campaign. In so holding, the Court emphasized the significance of the Government's reasons for taking the action that it did:

> We conclude that, as in [*Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)], the government's reason for demoting Heffernan is what counts here. When an employer demotes an employee out of a desire to prevent the employee from engaging in political activity that the First

Amendment protects, the employee is entitled to challenge that unlawful action under the First Amendment and 42 U.S.C. § 1983 – even if, as here, the employer makes a factual mistake about the employee's behavior.

*Id.* at 1418.

The Plaintiff in this case has alleged that he was terminated by the Turnpike Commission not pursuant to a long established, neutral rule prohibiting employees from being candidates for elective office, but rather pursuant to a rule adopted after he became a candidate for elective office, which was adopted to prevent him from pursuing the Democratic Party nomination for the State Senate seat held by the incumbent and to retaliate against him for doing so.

Plaintiff's allegations assert that the Turnpike Commission adopted a rule prohibiting employees from becoming candidates for elective office on pain of termination for doing so; that the rule was applied retroactively to Plaintiff who had become a candidate in July of 2013, some seven months before the January 7, 2014 adoption; and that the Turnpike Commission had no purpose for the adoption of the rule other than to prevent the Plaintiff from running against an incumbent State Senator whose candidacy the Commission members supported and, if he persisted in remaining a candidate, to terminate him in retaliation for doing so.

Plaintiff has therefore adequately alleged in Counts I and II of his Complaint violations of his free speech and free association rights under the First Amendment.

As to Count III, the Defendant argues that the Court should "dismiss Count III of the Complaint insofar it seeks money damages under Fed.R.Civ.P. 12(b)(1)." (Def.'s Br. in Supp. of Mot. to Dismiss, Doc. 17, at 22). Plaintiff agrees that "neither Pennsylvania statutory authority nor appellate case law has authorized the award of money damages for a violation of the Pennsylvania Constitution." (Pl.'s Br. in Opp. to Def.'s Mot. to Dismiss, Doc. 16-3, at 15). Plaintiff, however, cites *Pocono Mountain Charter School v. Pocono Mountain School District,* 442 F.App'x 681, 687 (3d Cir. 2011), as authority for the pursuit of equitable remedies, including declaratory or injunctive relief. (*Id.*). In light of the parties' agreement that money damages are unavailable with respect to Count III, any claim for money damages set forth in Count III will be stricken.

## V. CONCLUSION

For all of the foregoing reasons, the Motion to Dismiss of Defendant Pennsylvania Turnpike Commission (Doc. 8) will be denied, with Count III limited to declaratory and injunctive relief. A separate Order follows.

Robert D. Mariani
United States District Judge