# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DANIEL J. SAVAGE          :
                                  :
            Plaintiff,         :
v.                         :     **2:15-CV-6501**
                                  :     **(JUDGE MARIANI)**
**PENNSYLVANIA TURNPIKE** :
**COMMISSION**                :
                                  :
            Defendant.     :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On December 8, 2015, Plaintiff, Daniel Savage, filed this action against his former employer, the Pennsylvania Turnpike Commission ("the Commission") (Doc. 1). Plaintiff's three count Complaint alleges violations by Defendant of Plaintiff's constitutional right to free speech and association pursuant to 42 U.S.C. § 1983 and the Pennsylvania Constitution.

The Pennsylvania Turnpike Commission moved to dismiss the Complaint on February 12, 2016 (Doc. 8). The Court held oral argument on Defendant's Motion on June 3, 2016. By Memorandum and Order entered June 27, 2016, this Court denied the Pennsylvania Turnpike Commission's motion to dismiss while limiting Count III, brought under the Pennsylvania Constitution, to declaratory and injunctive relief. (Docs. 22, 23).

On September 14, 2017, the Commission moved for summary judgment (Doc. 54). As of November 30, 2017, all briefing by the parties was completed and the motion is now

ripe for resolution. (*See* Docs. 55, 61, 65-67). For the reasons that follow, the Court will deny Defendant's motion.

## II. STATEMENT OF MATERIAL FACTS

Defendant Pennsylvania Turnpike Commission submitted a statement of material facts as to which it contends there is no dispute, in accordance with Local Rule 56.1 of the Middle District of Pennsylvania Rules of Court. (Doc. 55). Plaintiff Savage responded to the Commission's statement of material facts (Doc. 61-2). In addition, Plaintiff filed his own counter-statement of material facts (Doc. 61-2) although, as properly noted by the Commission, such a counter-statement of material facts is not contemplated by the language of Local Rule 56.1. Nonetheless, the Defendant Commission responded to the specific paragraphs of Plaintiff's counter-statement of material facts and accordingly, the undisputed material facts set forth herein are drawn from both the Defendant's statement of material facts, Plaintiff's paragraph-by-paragraph response thereto, and Plaintiff's counter-statement of material facts which was likewise responded to by the Commission in the same manner.

Except where noted, the following facts are undisputed.

### A. Defendant's Statement of Material Facts

The Commission is an independent agency of the Commonwealth of Pennsylvania, created to construct, operate, and maintain the Pennsylvania Turnpike, the Beaver Valley Expressway, Amos K. Hutchinson Bypass, Mon/Fayette Expressway, Southern Beltway,

and Northeast Extension. (Def.'s Statement of Undisputed Material Facts ("DSOF"), Doc. 55, at ¶ 1).

Daniel Savage originally worked at the Commission from August 2003 to November 2006, first as a business representative and later as a safety compliance manager. Plaintiff was recommended for the job by then-Commissioner Mitchell Rubin. (*Id*. at ¶ 2).

In November 2006, the Plaintiff was elected in a special election as a member of the Philadelphia City Council, at which time he voluntarily left his employment at the Commission. (*Id*. at ¶ 3). Savage served on the Philadelphia City Council until January 2008, but then lost his seat in the next regular election. (*Id.* at ¶ 4).

Plaintiff learned that then-Eastern District manager, Carmen Marrone, was leaving and Plaintiff presumed that Robert Brady would be taking his position. Plaintiff then contacted Commission Chairman Mitchell Rubin to ask if Robert Brady's position would be available. Chairman Rubin informed the Plaintiff that Robert Brady's position was not available but that there might be another position for which Plaintiff was qualified. (*Id.* at ¶ 5; Pl.'s Resp. to Def.'s Statement of Material Facts ("Pl.'s Resp."), Doc. 61-2, at ¶ 5). Plaintiff denies that he contacted any other individual at the Commission to see if there was an open position. (Pl.'s Resp., at ¶ 5).

On October 22, 2008, Savage was offered the position of Regional Office Coordinator at the Eastern Regional Office ("ERO"), reporting to Robert Brady. In that

3

position, Plaintiff oversaw purchasing for the ERO and managed the ERO's fleet of "pool cars" for employees that needed to travel for work. (DSOF, at ¶ 6).

While employed in that position, Savage signed and acknowledged receipt of the employee handbook, which he described as "the rules of being an employee of the Pennsylvania Turnpike Commission." (*Id*. at ¶ 7). The handbook included the following statement:

> **Policy Letters**
>
> The attached list contains those policy letters in effect at the time of publication of this Employee Handbook. Policy letter are regularly updated. All policies are available for review on the Commission's intranet.
>
> If there is any difference between the handbook and the policy letter, the policy letter governs. It is the employee's responsibility to be aware of and familiar with any changes and updates to existing policies and the addition of any new policies.
>
> As an employee of the Commission, you are expected to adhere to Commission policies. Violators of these policies will be disciplined accordingly.

(Pennsylvania Turnpike Commission Employee Handbook, Doc. 54-8, Ex. 1).

In the 2011 election, Savage sought to win his seat back on the Philadelphia City Council. Plaintiff decided in January of 2011 that he wanted to take a leave of absence to pursue campaign activities full time. (DSOF, at ¶ 8). Savage first inquired with his direct supervisor, Brady, and learned that for any leaves of absence over ten days, he would need to seek approval from human resources. (*Id*. at ¶ 9).

4

On January 3, 2011, the Plaintiff called and then emailed Doreen McCall, the

Commission's Chief Counsel. In pertinent part, Plaintiff's email to McCall stated:

> This spring, 2011, I will be a candidate for City Council in the City of
> Philadelphia. Confirming our conversation, it is my understanding that I can
> remain an employee of the PTC as long as I do not take part in any political
> activity during work hours at the PTC.

(Doc. 54-8, Ex. 2).

At the time Savage wrote this email to Doreen McCall, the Commission's Code of

Conduct (Policy Letter 3.10) did not prohibit employees from running for office. The Code of

Conduct only prohibited Members or Executive-Level Employees (other than the Secretary

of Transportation) from being "a Public official or Party Officer" in the State. (DSOF, at ¶11).

McCall responded to Savage's January 3, 2011 email, stating that "[b]ased on the

facts as provided to me, the Commission's Code of Conduct would not prohibit you from

running for political office." (Doc. 54-8, Ex. 2). McCall further stated that based on Plaintiff's

job duties, he was unlikely to be considered as an "Executive-Level Employee" and that,

because his position did not involve programs funded with federal money, the federal Hatch

Act would not apply. (DSOF, at ¶ 12).

Savage thereafter requested, and was granted, a 45 day leave of absence. (Id. at ¶

13) (see also, Doc. 54-8, Ex. 4).

Savage lost his election bid for Philadelphia City Council. He returned to work at the

Commission in the same position he had held before. (Id. at ¶ 15).

In February, 2013, Mark Compton started as the Commission's new CEO. Compton had previously been employed as Deputy Secretary for Administration at the Pennsylvania Department of Transportation ("PennDOT"). (*Id.* at ¶ 16).

In March of 2013, Pennsylvania's Attorney General released a presentment accusing several former Commission employees of various forms of corruption. (*Id.* at ¶ 17). Savage admits that the presentment accused several executives and managers of illegal procurement practices, citing to Compton's deposition. (Pl.'s Resp., at ¶ 17). During Compton's deposition, he explained that "[t]he presentment was about procurement practices within the Commission. It was also about one or two of the employees' lost time, ghost employee type stuff." (Dep. of Compton, at 60:3-7). Compton further explained that "[i]t was political givings through different vendors and things like that as well." (*Id.* at 62:9-11). Plaintiff denies that the presentment "implicated the issue of Commission employees running for office or otherwise engaging in political activities", again citing to Compton's deposition. (Pl.'s Resp., at ¶ 17).

The presentment named, among others, the Commission's former CEO, Joe Brimmeier, and a former Commissioner, Mitchell Rubin. (DSOMF, at ¶ 18).

The Commission asserts that, in the wake of the presentment, it charged Mark Compton with reviewing all of the Commission's policies and implementing a series of reforms, both to prevent employees from engaging in similar wrongdoing in the future and to clean up the public's perception of the Commission. (DSOF, at ¶19). In response, Plaintiff

admits "only that Mr. Compton was charged with a review of Commission policies that arose from the allegations in the presentment relating to procurement policies." (Pl.'s Resp., at ¶ 19). Savage denies that the directive dealt with policies relating to employees running for office.

On March18, 2013, the Commission issued a press release entitled "PA Turnpike CEO Announces Additional Reforms to Operations." (Doc. 54-8, Ex. 5). In the release, CEO Compton detailed the steps the Commission planned on taking, including "conven[ing] a special advisory group to review and critique current Turnpike policies and procedures relating to contracting and other business practices to see where continued improvements can be made and to research best-practices at comparable agencies to learn from their experience and protocols." (*Id.*; *see also,* DSOF, at ¶ 20).

The Commission's Advisory Committee consisted of the Honorable Maureen Lally-Green, a retired Pennsylvania Superior Court judge, M. G. Patel, former Chief Engineer at PennDOT, and Professor John L. Gedid, Professor and Vice-Dean of Widener University School of Law. (DSOF, at ¶ 21). While Plaintiff acknowledges the appointment of an Advisory Committee, he responds that the Advisory Committee Report set forth only recommendations to "minimize or eliminate  undesirable practices cited in the presentment and did not recommend that any change be made to the policy prohibiting employees from holding public office." (Pl.'s Resp., at ¶ 21).

The Commission CEO Compton requested that Stacia Ritter, Director of Government Affairs for the Commission at that time, conduct research about the different kinds of codes of conduct in effect at other Pennsylvania government agencies. (DSOF, at ¶ 23). According to Defendant, Ritter responded in April, 2013, by providing a detailed chart describing the policies in place under the rules of the House of Representatives and Senate, the Governor's Code of Conduct, State Executive Order 1980-18, and the Gaming Board's Code of Conduct. (*Id*. at ¶ 24). Plaintiff denies the Defendant's statements made in paragraph 24, asserting that the "detailed chart" cited by Defendant is unreadable. Although Plaintiff and Defendant agree that Stacia Ritter also produced a memorandum, the parties disagree as to whether the memorandum, and specifically the page designated PTC001825 (Doc. 54-9, Ex. 7), addresses any issue related to political activity. (DSOF, at ¶ 25; Pl.'s Resp., at ¶ 25).

In June 2013, in-house attorneys at the Commission met with outside counsel who were retained to advise the Commission about making changes to the Commission's Code of Conduct. (DSOF, at ¶ 26).

By the summer of 2013, the Commission was reviewing its policies to determine whether they needed to be updated and the Commission had convened the Advisory Committee to further vet the Commission's policies. (*Id*. at ¶ 27).

With respect to the addition of a policy that would prohibit employees from running for office while employed at the Commission, Compton testified that implementing this new policy was his idea, explaining:

> [M]y biggest fear is that the Senate or the House would ask us to house somebody in order for them to run for office. I didn't want us to be the housing entity for anyone to hang out to run for office. I wanted to have really the same process in place that I knew at PennDOT.

(Dep. of Compton, at 71:20-72:3; DSOF, at ¶ 28). Compton also explained that, before he started his position at the Commission, "someone" at the Commission had run for "district magistrate or district justice" in western Pennsylvania. That individual was elected and thus preparing to leave the Commission, which prompted Compton to think about the Commission's policy in that regard. (Dep. of Compton, at 63:21-64:20; DSOF, at ¶ 29).

It is undisputed that on or around September 26, 2013, a draft of the new Code of Conduct was proposed and discussed in executive session with the Commissioners. (DSOF, at ¶ 30). However, Plaintiff asserts that "the September 27, 2013 draft of the Code of Conduct did not include any prohibition against Commission employees running for public office." (Pl.'s Resp., at ¶ 30).

A revised proposed Code of Conduct was presented at the October 11, 2013, Commission meeting. (DSOF, at ¶ 31). Plaintiff notes that this revised draft also did not contain any prohibition against Commission employees running for public office. (Pl.'s Resp., at ¶ 31).

On November 1, 2013, the Commission was presented with another revised proposal. The November 1, 2013, version of the proposed Code of Conduct included, for the first time, a resign-to-run provision. (*See* Doc. 54-10, Ex. 15). Plaintiff asserts that "this provision was added a week after Plaintiff's October 23, 2013 fundraiser and Senator [Vincent] Hughes' unsuccessful attempts to threaten the hosts of that fundraiser into withdrawing their support for Plaintiff's candidacy, and was added during the same time period in which [Commissioner Pasqual] Deon met with Senator Hughes and was called into a private meeting with Senator [Christine] Tartaglione." (Pl.'s Resp., at ¶ 32).

During the January 7, 2014, meeting of the Commissioners, the Commission unanimously passed the revised Code of Conduct. (DSOF, at ¶ 33). The minutes of the Commission's January 7th meeting address the approval of the revised Code of Conduct under "New Business", under the subheading "Payment of Invoice", as follows:

> Motion – That the Commission approves the revisions to Policy Letter 3.10, Code of Conduct, to expand the policy to create a more comprehensive Code of Conduct for Commission employees – was made by Commissioner Logan, seconded by Commissioner Deon, and passed unanimously.

(Doc. 54-11, Ex. 17).

The Code of Conduct adopted on January 7, 2014, contains the following subsection 9.3 in Section IX ("Public Office and Party Affiliation"):

> No Executive-Level employee or Employee shall be a candidate for nomination or election to any State or Federal Office unless he or she shall have first resigned from his or her employment with the Commission. State Office shall be deemed to include the following offices in the Commonwealth of Pennsylvania: Governor, Lieutenant Governor, Attorney General, Auditor

10

General, State Treasurer, Senator and Representative in the General Assembly, and Judge or Justice of any Court of the Commonwealth, including Magisterial District Court and Municipal Court. Federal Office shall be deemed to include Senator and Representative in the United States Congress.

(Doc. 54-11, Ex. 16).

The Advisory Committee reviewed the revised Code of Conduct as part of its 18-month review process and "commended the Commissions' [*sic*] substantial reform efforts" in its final report. (*Id.* at ¶ 37).

On January 7, 2014, the Commission's Chief Operating Officer, Craig Shuey, sent representatives of the three unions representing Commission employees a copy of the new Policy Letter 3.10, indicating it would be effective as of January 22, 2014. (DSOF, at ¶ 36). On January 27, 2014, the new Code of Conduct was posted in the "Document Library" section of the Commission's Intranet and Extranet. (*Id.* at ¶ 38). Savage testified that although he knew there was a "Document Library" page on the Intranet, he did not recall if he looked at it in 2014. (*Id.* at ¶ 39).

With respect to the update to the Code of Conduct, Patricia Schlegel, the Commission's director of human resources, explained:

> [T]he legal department was responsible for publishing it and it was published in the document section of intranet. It was not in the policy part of intranet because there were issues with an unrelated part of the Code of Conduct regarding personal leave. And those issues had to be resolved before it was put under the policy letters.

(Dep. of Schlegel, at 24:21-25:5).

The Commission asserts that the new Code of Conduct was further disseminated to employees beginning on January 31, 2014, when the Commission's attorneys, Al Peters and John Dwyer, began providing mandatory training sessions to employees with respect to the revisions. (DSOF, at ¶ 41). Savage, while admitting that "some employees received the email referred to in Paragraph 41 of Defendant's Statement of Material Facts and some attended the referenced training," denies that "all employees received that email or that Plaintiff was sent the email or were aware of its contents." (Pl.'s Resp., at ¶ 41). Further, Savage denies that he was invited to attend the referenced training. (*Id*.). Plaintiff similarly denies Defendant's statement of material facts relating to what occurred during the training session, again stating that while "it is admitted that some employees received the e-mail referred to in Paragraph 41 of Defendant's Statement of Material Facts and some attended the referenced training, it is denied that all employees received that email or that Plaintiff was sent the email or were aware of its contents." (*Id*. at ¶¶ 42, 43).

In response to the Commission's statement of fact that "Plaintiff was aware of the training session and had heard rumors about a new policy being passed, but he decided to not directly ask Brady or the legal department about the rumor of a new policy", Savage admits "only that Plaintiff heard rumors about a policy being passed because people at the Commission were not happy with Plaintiff running for State Senate, that Plaintiff was aware that training sessions were being held, and that Plaintiff did not ask Brady or the legal department about the rumor." (DSOF, at ¶ 46; Pl.'s Resp., at ¶ 46).

Savage was interviewed by a local newspaper reporter, Tom Waring, about Savage's intention to run for State Senate in the Second Senatorial District. The article appeared on February 12, 2014. (DSOF, at ¶ 48; Pl.'s Resp., at ¶ 48). Savage however denies that he gave the following quote to Waring attributed to him in the article: "Due to the code of conduct of my job, I cannot announce my candidacy or take any public endorsements." (*Id.*). Nonetheless, Plaintiff admits that paragraph 50 of Defendant's Statement of Material Facts accurately reflects Mr. Waring's deposition testimony that "although he does not specifically recall taking this interview, he took notes from his conversation and recorded it in the newspaper article within days of the conversation." (DSOF, at ¶ 50; Pl.'s Resp., at ¶ 50).

Plaintiff understood that the previous version of the Code of Conduct did not prohibit employees from running for office. (DSOF, at ¶ 49).

It is undisputed that Savage testified that he informed co-workers at the Commission of his impending run in June 2013. Plaintiff then held his first "kickoff" fundraiser in July 2013, however Plaintiff claims that he had not yet obtained signatures or filed his petition to become a candidate at that time because he viewed state law as specifying a time frame when he could do so. (DSOF, at ¶ 51; Pl.'s Resp., at ¶ 51). Commission CEO Compton and Commission COO Shuey became aware that Savage was considering a potential run in the summer of 2013. (DSOF, at ¶ 52).

On or about March 7, 2014, Savage approached his immediate supervisor, Robert Brady, to inform him that he intended to seek a 45-day leave of absence to permit him to devote more time to campaigning. (*Id*. at ¶ 53). Savage admits that Brady emailed his version of the conversation he had with Plaintiff to Patricia Schlegel but denies that the conversation contained any statement by Brady regarding the implications of the new Code of Conduct. (DSOF, at ¶ 54; Pl.'s Resp., at ¶ 54).

Plaintiff also admits that on March 10, 2014, he sent a letter to Human Resources formally requesting the leave of absence and that he referred to Doreen McCall's approval of a similar leave in 2011. (Pl.'s Resp., at ¶ 55). Savage filed his petitions that same day. (DSOF, at ¶ 56; Pl.'s Resp., at ¶ 56). Although Plaintiff admits that he filed his petitions to become a candidate on March 10, 2014, he denies that he was not a candidate for office before that date. (Pl.'s Resp., at ¶ 56).

Plaintiff further admits that on March 13, 2014, Schlegel addressed a letter to Savage stating:

> Dear Mr. Savage:
>
> It has come to our attention that you have filed the necessary documents to have your name appear on the ballot for elective office in the May 20, 2014 primary election. You have filed to run for Pennsylvania Senate.
>
> On January 7, 2014, the Commission approved revisions to Policy Letter 3.10 (Code of Conduct), which, among other things, prohibit employees from being a candidate for nomination or election to any State or Federal Office unless he or she resigns from Commission employment. Robert Brady specifically informed you of the policy changes and advised that they would be applicable to you should you choose to run for State office.

Contrary to your understanding, the fact that revisions to a Policy Letter have not been updated on the Turnpike Intranet does not affect its validity. Likewise, the Commission is not required to obtain your signature as to your agreement or disagreement with any policy letter. Any change to any policy is within the sole discretion of the Commission.

Therefore, should you decide to remain a candidate for Senate, you must resign your position within ten (10) days of the date of this letter or your employment with the Commission will be terminated.

(*Id*. at ¶ 58; Doc. 54-12, Ex. 28).

Savage has admitted that neither Schlegel nor Compton testified that he would be fired even if he withdrew from the Senate race. (Pl.'s Resp., at ¶ 60). However, Plaintiff further states that "no Turnpike official assured Plaintiff that, if he withdrew from the senate race, his employment would not be terminated." (*Id*.). Nonetheless, Plaintiff admits that he "did not directly seek that assurance." (*Id*. at ¶ 61).

On March 20, 2014, Plaintiff responded to the March 13, 2014 letter sent to him by Schlegel. That letter in part states:

It is clear that I have been unfairly and unlawfully made a target for retaliation for exercising my First Amendment Rights. The coercive demand for me to withdraw as a candidate for office as quid pro quo is also clear evidence of the true illegal and improper purposes of these actions by you, the Commission, and those acting in concert with it.

(Doc. 54-12, Ex. 29).

On March 24, 2014, Schlegel sent Savage a letter terminating his employment for violating § 9.3 of Policy Letter 3.10. (Doc. 54-12, Ex. 30). The letter was preceded by the March 24, 2014, approval for termination given by Compton to Schlegel, and signed by

Compton on March 26, 2014. (Doc. 54-12, Ex. 31). Plaintiff admits that Schlegel sent him a termination letter on March 24, 2014 and that Compton approved the termination of Plaintiff's employment on March 26, 2014. (Pl.'s Resp., at ¶ 64). Plaintiff further admits that at a meeting of the Commissioners on April 1, 2014, the Commissioners unanimously approved Savage's termination of employment. (DSOF, at ¶¶ 65, 66; Pl.'s Resp., at ¶¶ 65, 66).

Savage and the Commission present sharply divergent views with respect to the existence or absence of evidence of any political retribution by the Commission against Plaintiff. Thus, Plaintiff does not admit and specifically disputes the statements set forth in paragraphs 66, 67, 68, 69, 70 and 72 of the Defendant's Statement of Material Facts.

Plaintiff does admit that Senator Tartaglione requested that Commissioner Deon meet with her in a private meeting but denies that Deon and Tartaglione in their deposition testimony confirmed that they did not discuss Plaintiff's candidacy for Tartaglione's seat during that conversation. (DSOF, at ¶ 73; Pl.'s Resp., at ¶ 73). Plaintiff admits that Senator Tartaglione testified that she had supported Plaintiff in his 2011 campaign for City Council and that she "had no knowledge of the regulations or 'inner workings of the Turnpike. And that's something that's not on my radar . . . .'" (Id. at ¶ 74). Senator Tartaglione also testified that she did not have a discussion with Deon concerning Savage and that she had no discussion with anyone on Deon's behalf, or representing or associated with Deon, concerning Savage; that she had no discussion with anyone from the Turnpike Commission

16

concerning Savage; and that she never asked anyone at the Turnpike to take action with respect to Savage. (*Id.* at ¶ 75).

Plaintiff admits that "[d]uring discovery, Plaintiff has focused extensively on phone calls that Senator Hughes made to some of Plaintiff's supporters 'telling them that he did not want them to raise money for Plaintiff's Senate campaign or to otherwise support Plaintiff's campaign.'" (*Id.* at ¶ 77).

Plaintiff further admits that "Senator Hughes testified that, although he knew who Plaintiff was, *i.e.*, that Plaintiff was considering running against Senator Tartaglione, he had "no recollection of 'knowing where [Plaintiff] was employed,' if anywhere." (*Id.* at ¶ 78).

Plaintiff also admits the accuracy of Defendant's description of Senator Hughes deposition testimony wherein Senator Hughes testified that he made telephone calls to several of Savage's campaign donors and explained that he supported Senator Tartaglione because she is "[a] good Senator, a good member of our caucus" and that he believed that "[w]hen the Democrats in the Senate are low in representation, are not in the majority, why would we want to have a Democratic primary fight when those resources could be used for the general election in other races where  Democrats could pick up seats.'" (*Id.* at ¶ 79).  In admitting the accuracy of Defendant's statement of Senator Hughes' testimony, Plaintiff adds "it is denied that a reasonable jury would necessarily ascribe his stated motives as credible in light of his long association with Senator Tartaglione and his support for her candidacy." (Pl.'s Resp., at ¶ 79).

17

Savage denies that Senator Hughes did not impliedly make threats by the nature and tone of his phone calls, thus controverting the statements of fact set forth by Defendant at paragraphs 80, 81 and 82 of its Statement of Material Facts. (DSOF, at ¶¶ 80-82; Pl.'s Resp., at ¶¶ 80-82).

## B. Plaintiff's Counter-Statement of Material Facts

The Commission admits paragraphs 1-7 and paragraphs 10-12 of Plaintiff's Counter-statement of Material Facts. (See Pl.'s Counter Statement of Material Facts ("PCSF"), Doc. 61-2; Def.'s Resp., Doc. 65-1). These statements are essentially repetitive of the Defendant's Statement of Material Facts in that they present historical information concerning Plaintiff Savage's employment with the Turnpike Commission, his election to a seat on the Philadelphia City Council, his resignation from employment with the Commission in November 2006 in order to so serve, his unsuccessful bid to regain his seat on the Philadelphia City Council, his return to employment in a non-executive position as the Regional Office Coordinator of the Commission's Eastern Region, his receipt of the then current Code of Conduct which had become effective in October of 2007 which did not prohibit non-executive level employees from running for elective office in Pennsylvania state government, his decision to again run for Philadelphia City Council in 2011, and the email he received from Doreen McCall, Chief Counsel for the Commission, on January 3, 2011, which stated that he would not be prohibited from running for political office and warned him that he was restricted from engaging in political activity during business hours as well as

from using Commission resources and equipment for campaign purposes. Likewise, Plaintiff's counter-statement confirms that Savage requested a leave of absence so that he could devote more time to his campaign, that this leave was approved by COO Shuey and confirmed by Human Resources Director Schlegel, and finally, that Plaintiff's 2011 campaign was unsuccessful and he returned to his position with the Commission in May 2011. (*Id.* at ¶¶ 1-7, 10-12).

Paragraph 13 of Plaintiff's counter-statement of facts asserts the following:

In or about March 2013, Plaintiff began considering seeking the Democratic Party nomination for the position of State Senator for the Second Senatorial District, a seat that was and is held by Senator Tartaglione, and was quoted by the local press that he believed "there are several factors that could help him defeat the incumbent." [*Northeast Times* article dated March 27, 2013, P-20, p. 2] In that same article, Senator Vincent Hughes, minority party chair of the powerful Appropriations Committee of the Pennsylvania State Senate voiced his support for the sitting Senator "that begins with making sure that we are all there for Sen. Tartaglione." [P-20, p. 1].

(PCSF, at ¶ 13). The Commission responds to this statement with an objection, arguing that "the cited newspaper article is inadmissible hearsay." (Def.'s Resp., at ¶ 13).

Federal Rule of Civil Procedure 56(c)(2) expressly provides that a party may object that evidence offered to support or oppose summary judgment cannot be presented in an admissible form. That objection may be raised in a specific motion to strike, but may also be raised in a response or reply papers. 1 Moore's Federal Rules Pamphlet § 56.5 [2][a] (Matthew Bender) (2018).

Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment. *Cf. Shelton v. Univ. of Med. & Dentistry*

19

*of N.J.*, 223 F.3d 220, 223 at n. 2 (3d Cir. 2000) ("In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable in admission at trial.").

*Smith v. City of Allentown*, 589 F.3d. 684, 693 (3d Cir. 2009).

Defendant cites to *James v. Tri-Way Metalworkers, Inc.*, 189 F.Supp.3d. 422, 429

(M.D. Pa. 2016) in support of its objection. Defendant's reliance on *James* at this stage of

the proceedings is unavailing. In *James*, this Court stated:

> A non-moving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Rather, the evidence may be considered if it can be reduced to admissible evidence at trial. *Id*. at 327, 106 S.Ct. 2548. Thus, hearsay statements must be capable of admission at trial in order for a court to consider them on summary judgment. *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000). Hearsay will be inadmissible absent falling within a hearsay exception established in Fed. R. Evid. 803 and 804, satisfying the residual hearsay exception found in Rule 807, or being considered non-hearsay under rule 801(d). In the case of hearsay within hearsay, each part of the combined statements must conform with an exception to the rule against hearsay in order to avoid exclusion. Fed. R. Evid. 805. A proponent of the evidence at issue has the burden of establishing that it is admissible. *Pittsburgh Press Club v. U.S.*, 579 F.2d 751, 758 (3d Cir. 1978).

*Id.* at 432-433.

Although the Court declines to rule on the admissibility of the *Northeast Times* article

as well as the statements contained in it, at trial, both the Plaintiff and Senator Vincent

Hughes could provide testimony on the subject matter of the article that may be admissible.

Defendant's objection, therefore, is overruled insofar as it has application to this summary

judgment analysis.

In any event, paragraph 13 also contains the statement that "[i]n or about March 2013, Plaintiff began considering seeking the Democratic Party nomination for the position of State Senator for the Second Senatorial District, a seat that was and is held by Senator Tartaglione. . . ." Defendant did not admit or deny this statement and the Court thus deems it admitted.

The Commission admits that "[i]n or about June 2013, Plaintiff announced his intention to seek that Senate seat and began raising money for that campaign for the Democratic Party nomination through publicized funding events." (PCSF, at ¶ 14; Def.'s Resp., at ¶ 14).

It is undisputed that "[o]n July 15, 2013, Plaintiff announced his first fund-raising event to take place in North Wildwood New Jersey six days later on July 21, 2013." (Id. at ¶ 17).

On July 19, 2013, Savage asserts that "at a fund-raising event for City Councilman Bobby Henon, Plaintiff's immediate supervisor, Robert G. Brady, shared with Plaintiff an e-mail he had received from Chief Operating Officer Shuey expressing Shuey's extreme displeasure with the July 17, 2013 Philadelphia Daily News article . . . and Plaintiff's announced candidacy for the Democratic nomination for State Senate." (PCSF, at ¶ 19). The *Philadelphia Daily News* article entitled "Trouble for Tartaglione" contains statements attributed to Savage which are critical of Tartaglione and makes reference to his planning of a political fund-raiser and intentions to challenge Tartaglione for the State Senate seat. (*See* Doc. 61-18, Ex. 21). In response, the Commission objects on the basis that the asserted

email from Shuey "does not exist." (Def.'s Resp., at ¶ 19). For the reasons previously set

forth, *supra*, at pages 19-20, this objection is overruled solely for purposes of this summary

judgment analysis. On the state of the record evidence, the Court cannot conclusively

determine that Plaintiff's description of the contents of this email is barred by the best

evidence rule or whether it is otherwise inadmissible as double hearsay. Federal Rule of

Evidence 1004 permits the use of secondary evidence where the original has been lost or

destroyed, unless the proponent lost or destroyed it in bad faith. Fed. R. Evid. 1004 (a).

*See, e.g., Byrd v. Wisconsin Dept. of Veterans Affairs*, 2015 WL 1745881, \*3 (W.D. Wisc.

2015) (because record suggested missing email had been lost or destroyed, Plaintiff's

recollection of message was sufficient to move case past summary judgment).

On September 16, 2013, Chris Brennan, a *Philadelphia Daily News* Political Editor,

sent an email entitled "Political activity" to Turnpike employee Carl DeFebo which stated:

Carl,

I'd like to know if the Pennsylvania Turnpike Commission has any policies on
political activity by employees. Specifically, I'd like to know if Turnpike
Commission employees are allowed to continue working while running for
elected public office or whether they have to resign or take a leave of
absence?

(Doc. 61-19, Ex. 25). It appears that email was circulated to Mark Compton, Doreen

McCall and Craig Shuey of the Commission, among others. (*See id.* at PTC01603).

Three weeks later, on or about October 7, 2013, Savage distributed invitations for a

fund-raising event to be held at the Palm restaurant on October 23, 2013. (PCSF, at ¶ 22).

22

Senator Vincent Hughes made three phone calls to the hosts of that fund-raiser, Mark Sheppard, Fred Santarelli, and Shannon McClure-Roberts. The Commission denies that the conversations were "threatening or inappropriate". (PCSF, at ¶ 23; Def.'s Resp., at ¶ 23).

In March of 2013, several former Commission employees, including a former Commissioner, the Commission's former CEO, as well as mid-level managers, were the subject of a grand jury presentment by the Pennsylvania Attorney General. (PCSF, at ¶ 25). The Commission admits that the presentment was issued in March of 2013 and further admits that the presentment included "among other things, allegations of corruption based on the influence of State elected officials." (Def.'s Resp., at ¶ 25). Defendant denies that the presentment was limited to procurement issues. (*Id.*).

Mark Compton attested that he was not aware that Savage had engaged in any such activity including taking gifts or money during his employment. (PCSF, at ¶ 26).

The parties dispute whether, in response to the presentment, the Commissioners directed Mark Compton, the newly hired Commission Chief Executive Officer to conduct a review of the Commission's Code of Conduct with respect to issues that led to the grand jury presentment or whether Compton was directed to review the Commission's policies "broadly". (PCSF, at ¶ 27; Def.'s Resp., at ¶ 27). Clearly, however, the parties agree that Compton was directed to undertake a review of the Commission's Code of Conduct.

On September 26, 2013, a revised Code of Conduct was prepared that did not include "the prohibition on employee's [*sic*] running for or holding statewide office." (*See*

PCSF, at ¶ 28; Def.'s Resp., at ¶ 28). On October 11, 2013, another revised Code of Conduct was presented to the Commissioners that again made no change to the existing Code policy relating to the holding of public office. (*Id.* at ¶ 29)[1].

During the months of October, November, and December of 2013, Savage openly continued his fund-raising efforts. (*Id.* at ¶ 29).

The Commission admits that the policy containing the prohibition against a Commission employee running for public office was not added to the Code of Conduct until the November 1, 2013 draft. (Def.'s Resp., at ¶ 30).

The Commission also admits that Commissioner Deon was re-nominated on October 11, 2013 and confirmed on December 10, 2013, but denies that constitutes the same time period in which the prohibition against Commission employees running for public office was added to the Code of Conduct. (*Id.* at ¶ 31).

Commissioner Deon met with Senator Vincent Hughes and other Senators during the re-nomination process. (Def.'s Resp., at ¶ 32). Before the confirmation vote on Commissioner Deon, Senator Tartaglione met with Commissioner Deon, along with Stacia Ritter. (*Id.* at ¶ 33). The Defendant maintains that it is "undisputed" that Senator Tartaglione and Commissioner Deon did not discuss the Plaintiff. (*Id.*). In support of this position, Defendant cites to Deon's deposition testimony wherein he responded in the negative when asked whether during his discussion with Tartaglione he "discuss[ed] Daniel Savage at all".

_____

[1] Plaintiff's counter-statement contains two paragraphs designated as paragraph 29.

(Dep. of Deon, at 44:13-16). However, Commissioner Deon also testified at his deposition as follows:

> **Q**: How long did you meet with Senator Tartaglione?
>
> **A**: Maybe fifteen minutes.
>
> **Q**: What did you discuss during that conversation?
>
> **A**: *I don't recall.*

(*Id.* at 12:24-13:5) (emphasis added).

The Turnpike Commissioners on January 7, 2014, approved a revised Code of Conduct. This Code of Conduct at § 9.3 revised the prior rule, which prohibited Commission employees from holding public office, to prohibit Commission employees from running for office. The minutes of the January 7, 2014 meeting of the Commission Board did not include any mention of any specific provision in the Code of Conduct. (PCSF, at ¶¶ 34, 35).

The revised Code of Conduct was thereafter immediately posted in the "Documents" section of the Intranet. This revised Code of Conduct could be found in the Document Library, but not in the Policies section. (PCSF, at ¶ 36, 37; Def.'s Resp at ¶¶ 36, 37). Rather, if an employee looked in the Policies section of the Intranet, he or she would find the 2007 version of the Code of Conduct. (PCSF, at ¶ 37).[2] CEO Mark Compton testified that "in preparation for [his deposition of 3/22/2017], I did become aware that [the revised

---

[2] In response this statement of fact by Plaintiff, Defendant merely admits that the revised Code of Conduct could be found in the Document Library but not in the Policies section. (*See* Def.'s Resp., at ¶ 37). Defendant does not deny, or even address, Plaintiff's statement that the 2007 version of the Code of Conduct remained posted in the Policies section of Intranet. The Court thus deems that statement of fact as undisputed.

Code of Conduct] was put on intranet, but I guess put under documents, may not have been deemed readily available to folks." (Dep. of Compton, at 83:17-21).

The Commission denies that three months after Savage was fired for violating an "unpublished Code of Conduct prohibition," that the revised Code of Conduct was for the first time "formally published" to employees and placed in the Policies section of the Commission Intranet in June of 2014. (*See* PCSF, at ¶ 40; Def.'s Resp., at ¶ 40). Instead, Defendant asserts that the revised Code of Conduct "was adopted in January 2014, and immediately posted in the Document Library section of the Intranet, sent to the unions, and training began for employees." (Def.'s Resp., at ¶ 40). Thus Defendant denies Plaintiff's assertion that the revised Code of Conduct was formally published for the first time in June of 2014 by its placement in the Policies section of the Commission Intranet. (*Id.*).

Plaintiff and Defendant also disagree as to Mark Compton's reasons for proposing changes to the Code of Conduct with respect to employees being required to resign in order to run for political office. However, it is undisputed that Compton testified as follows:

> [M]y biggest fear is that the Senate or the House would ask us to house somebody in order for them to run for office. I didn't want us to be the housing entity for anyone to hang out to run for office. I wanted to have really the same process in place that I knew at PennDOT.

(Dep. of Compton, at 71:20-72:3). Plaintiff also notes that Compton admitted that he was not aware of any State legislators putting any pressure on the Commission to hire people. (PCSF, at ¶ 41) (citing Dep. of Compton, at 74:15-19 (**Q**: During your tenure, were you

aware of anybody who was intending to run for office being pushed to become an employee of the Commission? **A**: No.)).

The Commission acknowledges that in response to Plaintiff's requests for documents, it presented a privilege log with 294 entries of documents claimed to be protected by attorney-client, work product, or executive privilege. (Def.'s Resp., at ¶ 41).[3] Defendant, in admitting this statement, also notes that the Plaintiff "has never challenged or objected to any of the entries on the Commission's privilege log." (*Id.*). It denies that 133 of these entries relate directly to documents that would reveal information relating to the change to the Code of Conduct's resign-to-run prohibition. (*Id.* at 42).

The Commission also denies Plaintiff's statement of material fact that when Plaintiff's counsel attempted to ask Compton, Shuey, and Deon about when the restriction on public office was added, or why it was added, Defendant's counsel refused to let the witnesses answer, and claimed that all discussions took place in the Commissioners' Executive Session or with counsel in the securing of legal advice and were therefore covered by the attorney-client or executive privilege. (*See* PCSF, at ¶ 43; Def.'s Resp., at ¶ 43).[4]

On March 10, 2014, the Plaintiff requested a leave of absence of 45 days through May 23, 2014. (PCSF, at ¶ 49). In response to Savage's request, on March 13, 2014,

---

[3] Plaintiff's counter-statement of facts contains two paragraphs numbered as 41.

[4] Defendant objects to paragraphs 46 and 47 in Plaintiff's Counterstatement of Material Facts as containing out-of-court statements as inadmissible hearsay. Here again, the Court declines to rule on the ultimate admissibility of the testimony of Bernie Bydlon or the testimony of Don Steele. However, for purposes of summary judgment analysis, the objections are overruled.

Patricia Schlegel sent a letter via certified and regular United States mail to Plaintiff advising him that the Code of Conduct had been changed and stating that "[o]n January 7, 2014, the Commission approved revisions to Policy Letter 3.10 (Code of Conduct), which, among other things, prohibit employees from being a candidate for nomination or election to any State or Federal Office unless he or she resigns from Commission employment" and providing Savage with "ten (10) days of the date of this letter" to resign his candidacy or he would be terminated. (Doc. 54-12, Ex. 28; *see also*, PCSF, at ¶ 50).

Savage responded to Schlegel's letter of March 13, 2014, asserting that the unpublished Policy was not properly implemented and therefore, unenforceable, and that the Policy constituted an unconstitutional restraint on his rights of free speech and association. Plaintiff also complained that he had not been made aware of the Policy and suggested that the actions being taken against him were "instigated by political forces outside the Commission." (PCSF, at ¶ 54; *see also*, Doc. 54-12, Ex. 29).

In a letter dated March 24, 2014, Schlegel informed Savage that his employment with the Commission would be terminated effective the following day based on the new Code of Conduct provision requiring that employees who wish to run for office must resign their employment. (Doc. 54-12, at 30; *see also*, PCSF, at ¶ 55; Def.'s Resp., at ¶ 55). CEO Compton approved the termination of Plaintiff's employment. (PCSF, at ¶ 57; Def.'s Resp., at ¶ 57).

Additionally, Savage asserts that after he received the March 13, 2014, letter from Schlegel, Commissioner Deon stated in the presence of Congressman Robert Brady, the father of Savage's supervisor, while they were at the Philadelphia Union League, that Deon was going to destroy Plaintiff. (PCSF, at ¶ 51). Defendant objects to this statement as triple-hearsay, responding that Plaintiff's testimony is that "Congressman Brady told Plaintiff's father about Deon's alleged statement; Plaintiff's father then told Plaintiff about what Congressman Brady said that Commissioner Deon had said." (Def.'s Resp., at ¶ 51).

The admissibility of the alleged statement by Deon would require Congressman Brady to present it at trial as having been made to him by Deon, and, were he to do so, the testimony may be admissible as a non-hearsay statement under Fed. R. Evid. 801(d)(2). On the other hand, if it were presented in the manner described by Defendant, above, it would likely be inadmissible as multiple hearsay. The Court again, however, declines to rule on the ultimate admissibility at trial of such testimony, particularly given the unsettled nature of who precisely would present such testimony. Suffice it to say, for a summary judgment analysis, the objection is premature and overruled.

Defendant asserts that no Commission employee since Savage has sought to run for state or federal office. As a result, the parties agree that the new Code of Conduct provision prohibiting employees from running for public office has not been enforced against anyone except Plaintiff. (PCSF, at ¶ 56; Def.'s Resp., at ¶ 56).

### III. Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light

most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). Likewise, courts must construe questions of credibility in favor of the non-moving party. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990) ("We are keenly aware that credibility determinations are not the function of the judge; instead the non-movant's evidence must be credited at this stage.") (citing *Anderson*, 477 U.S. at 249, 255).

Nonetheless, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted). Further:

> To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial. *See* Fed.R.Civ.P. 56(e).

"While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Hugh* [*v. Butler Cty. Family YMCA,* 418 F.3d 265, 267 (3d Cir. 2005)] (citing *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505).

*Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007).

## IV. ANALYSIS

### A. Contentions of the Parties

The Commission seeks summary judgment on two fundamental grounds: (1) that its adoption on January 7, 2014, of a revision to its Code of Conduct which prohibited, for the first time, Commission employees from running for public office, has been shown by the undisputed facts of record to be justified by "reasonable necessity" which as a matter of law, operates to defeat Plaintiff's free speech claim generally and was reasonably necessary to prohibit Plaintiff's running for office specifically; and (2) that the undisputed record evidence establishes that Plaintiff has not shown a genuine dispute of material fact with respect to the issue of whether any constitutionally protected conduct engaged in by Savage was a substantial or motivating factor in the Commission's decision to terminate him.

In support of the Commission's first contention, that it has shown "reasonable necessity" for the revision to its Code of Conduct prohibiting a Commission employee from running for State or Federal office, the Commission assets that it was "faced with a situation in which several former employees, including a former Commissioner and CEO, were indicted on corruption charges . . . . Shortly before the presentment was issued, the Commission had hired a new CEO, Mark Compton, who was directed to review all the

Commission's policies and present recommendations to reform them." (Def.'s Br. in Supp. of Mot. for Summ. J., Doc. 54-15, at 13). The Commission then asserts that Compton directed Stacia Ritter, then the Director of Government Affairs, to research the policies in place in other Commonwealth agencies, which included prohibitions on running for partisan office. (*Id.*).

In addition, the Commission points to the deposition testimony of CEO Compton where, in explaining his motivation for the adoption of the revision in question to the Court of Conduct, noted that he had become aware of one Commission employee who had run for elective office before Compton became employed with the Commission, and Compton accordingly testified:

> [M]y biggest fear is that the Senate or the House would ask us to house somebody in order for them to run for office. I didn't want us to be the housing entity for anyone to hang out to run for office. I wanted to have really the same process in place that I knew at PennDOT.

(*Id.* at 14 (citing DSOF, at ¶ 28)).

The Commission argues that its passage of the revision to its Code of Conduct to prohibit employees from becoming a candidate for State or Federal office serves the same purposes that caused the United States Supreme Court to uphold "equivalent restrictions" in *United States Civil Service Commission v. National Association of Letter Carriers AFL-CIO*, 413 U.S. 548 (1973). The Commission identified those considerations as "(1) reducing the hazard that employees will execute the law in a partial manner; (2) reducing the appearance to the public that employees are 'practicing political justice'; (3) preventing the building of a

political machine; and (4) protecting employees from pressure and tacit invitation to perform political chores to curry favor with superiors." (Doc. 54-15, at 14).

The Commission cites the substantial body of case law wherein restrictions on running for or holding public office have been upheld. (*Id*. at 14-15). Thus, the Commission argues that because of its "interest in ensuring that its policies prohibited actual corruption and combatting the perception of corruption by the public in the wake of the 2013 presentment," the Commission has met its burden to show reasonable necessity for its revision of Section 9.3 in its Code of Conduct prohibiting Commission employees from being a candidate for nomination or election to any State or Federal office unless such employee has first resigned from his or her employment with the Commission. (*Id*. at 16).

The Commission advances as its second ground for the entry of summary judgment in its favor, its contention that the undisputed evidence of record shows that the passage of the amendment to the Code of Conduct prohibiting Commission employees from running for State or Federal office without first having resigned was unrelated to Savage's candidacy for the State Senate. The Commission further asserts that Savage has not shown a genuine dispute of material fact for trial as to the existence of any causal relationship between his candidacy and the Commission's adoption of the "resign-to-run" rule added to Section 9.3 of the Code of Conduct. The Commission argues that it is undisputed that it learned of Plaintiff's campaign activities in the summer of 2013 and that Plaintiff's termination in March of 2014, nearly eight months later, does not support a claim that there exists sufficient

"temporal proximity" between the Commission's knowledge of Plaintiff's protected activity and his termination to allow Plaintiff's claim to proceed to trial. (Doc. 54-15, at 18-19).

Similarly, the Commission moves for summary judgment on the basis that Savage "cannot show a pattern of antagonism toward him." The Commission argues that the single incident in which a report was made to the Commission's COO, Craig Shuey, where someone reported that Plaintiff was using his Commission vehicle for political purposes, is insufficient to show proof of animus and that, in any event, the Commission's chief counsel found no merit to the allegation against Savage. (Doc. 54-15, at 19-20).

Finally, the Commission argues that "Plaintiff cannot point to record evidence from which 'the trier of fact' should infer causation.'" (*Id*. at 20) (quoting *Gulick v. City of Pittston,* 995 F.Supp.2d 322, 336 (M.D. Pa. 2014)). Thus, the Commission asserts:

> To survive summary judgment, therefore, Plaintiff would have to point to sufficient evidence to allow a reasonable jury to conclude that the Commission engaged in this costly, year-long reform process, changing the entire Code of Conduct, of which the Policy was one part, to be able to use it to discharge Plaintiff.

(*Id*. at 20-21).

The Commission states that Commission CEO Compton does not know Senator Tartaglione and Commission COO Shuey "never spoke to Compton, any of the Commissioners, or to Senators Tartaglione or Hughes about Plaintiff." (*Id*. at 21). Similarly, the Commission notes that Stacia Ritter, the Commission's then Director of Government

35

Affairs, "only learned about Plaintiff's running for office after his employment was terminated." (*Id.*).

In similar fashion, the Commission argues that Savage has failed to show a genuine dispute for trial arising out of a meeting between Senator Tartaglione and Commissioner Deon in December of 2013 during Commissioner Deon's re-confirmation process. (Doc. 54-15, at 21). The Commission asserts that "Deon was re-nominated as a Commissioner in October 2013, and, as part of the reconfirmation process, met with numerous Senators, including Senator Tartaglione." (*Id.* at 22). The Commission thus claims that it "is undisputed that, when Senator Tartaglione and Commissioner Deon met as part of the reconfirmation process (in the presence of Ritter, the Commission's then Director of Government Affairs), they did not talk about Plaintiff or the election at all." (*Id.* at 22).

The Commission further argues that the meeting between Senator Tartaglione and Commissioner Deon occurred between October and December of 2013 which was well after the Commission had begun its review of its policies and months after Ritter had identified to Compton the "Commission's policy lacuna regarding employees running and holding office." (*Id.* at 22).

As a result, the Commission contends that Plaintiff's claim is entirely speculative, as it is unsupported by evidence that the Commission retaliated against him by enacting the revision to the policy within its Code of Conduct which prohibited employees from becoming

a candidate for State or Federal office without first having resigned employment with the Commission.

In response, Savage, after citing the requirements for stating a claim for retaliation under 42 U.S.C. § 1983 based upon political activity as stated in *Goodman v. Pennsylvania Turnpike Commission*, 293 F.3d 655, 663-64 (3d Cir. 2002), argues:

> In the present matter, there is no issue relating to whether Plaintiff works for a public agency that does not require a political affiliation nor are there issues of whether his position was a decision making one for which protections may not attach or that his political activity was not the basis for his discharge. Accordingly, in the context of the claimed constitutional torts in his Complaint, to be successful, Plaintiff Savage needs only to satisfy the final required prong of causation between the alleged protected activity (*i.e.* his candidacy) and the termination of his employment.

(Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J., Doc. 61-1, at 11).

Plaintiff then disputes the assertion by the Commission that there is not the required temporal proximity between the protected activity of his candidacy and the allegedly retaliatory action manifested in his discharge from employment or a pattern of antagonism coupled with timing to establish a causal link, citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d. 259, 267 (3d Cir. 2007). (*Id*. at 11-12).

Plaintiff argues that the Commission has failed to show the absence of a triable dispute of fact as to whether the revision to the Policy in the Commission's Code of Conduct, which prohibits employees from becoming a candidate for State or Federal office unless the employee first resigns, was "reasonably necessary". Plaintiff further argues that there are genuine disputes of material fact as to whether the Commission enacted the

37

prohibition upon a Commission employee being a candidate for State or Federal office without resigning was enacted for a constitutionally impermissible purpose "to chill the Plaintiff's First Amendment rights and to retaliate against him for having exercised them." (*Id*. at 12) (citing Ct.'s Mem. Op., Doc. 22, at 20-21, 23-26)).

With respect to the "reasonable necessity" requirement, Plaintiff argues that the Commission's attempt to obtain summary judgment based upon the testimony of Mark Compton as to why the resign-to-rule was enacted, including the March 2013 grand jury presentment against former Commission members and employees, and his biggest fear that "the Senate or the House would ask us to house someone in order for them to run for office" should be rejected by this Court. (*Id*. at 14). Plaintiff writes that "it is respectfully suggested that those unsupported fears and unnecessary actions are subject to credibility determinations that must be left to a jury to determine whether they, standing alone, have allowed Defendant to meet its burden to prove 'reasonable necessity' for the constraint it placed on Plaintiff's free speech and association." (*Id*. at 14-15).

Plaintiff further complains that Defendant has "employed the bar of attorney-client and executive privilege to disallow any exploration by Plaintiff of its true motives for enacting the resign-to-run prohibition on free speech and association, and therefore, must be estopped from raising the guise of good government as a defense." (*Id*. at 15). Plaintiff argues that he has been prevented from exploring the "veracity" of the Commission's witnesses so that he has been deprived of inquiring as to the "true motive" of the

Commission's enacting of the change to the Policy in the Code of Conduct. Plaintiff states

that he was precluded from inquiring at the depositions of Commission employees

Compton, Shuey, and Ritter as to conversations relating to the enactment of the revision to

the policy in question. Plaintiff argues that the Commission "is improperly employing

privilege as both a 'sword and shield'" and that this is "an abuse that courts have universally

discouraged." (*Id*. at 16-17) (citations omitted). Accordingly, Plaintiff requests that this court

rule that the Defendant "cannot argue or present any evidence that the prohibition of

running for office while employed is 'reasonably necessary'." (*Id*. at 17).

With respect to the Commission's argument that the addition of the prohibition

against a Turnpike Commission employee being a candidate for State or Federal office

unless that employee first resigns employment was justified by the indictment of several

former Commission employees, including the former Commission CEO on corruption

charges, Plaintiff argues that those indictments cannot serve as a basis for the prohibition

on employees being candidates for public office. Plaintiff asserts that the indictments had

nothing to do with Commission employees running for office, but rather, that the misconduct

underlying the indictments involved illegal procurement practices "including Commission

employees taking kickbacks or improper gifts." (*Id*. at 18). Plaintiff emphasizes that the

independent advisory committee appointed to make recommendations to "minimize or

eliminate undesirable practices" did not recommend or otherwise reference the addition of a

prohibition against Commission employees running for office. (*Id*.). Plaintiff thus asserts

that there is no connection between the change in the Code of Conduct at issue in this case and the earlier grand jury indictment of former Turnpike Commission employees.

Savage further argues that the temporal proximity necessary to allow an inference of discrimination and unlawful retaliation is demonstrated by the content and sequence of the drafts of the Code of Conduct that were produced in discovery. Plaintiff asserts that the September 26, 2013, and October 11, 2013, drafts of the Code of Conduct did not include a prohibition on Commission employees becoming candidates for State or Federal office. Instead, "[t]hat prohibition was only added in the November 1, 2013 draft that was issued a week after Plaintiff's October 23, 2013 fundraiser and Senator Hughes' unsuccessful attempts to threaten the hosts of that fundraiser into withdrawing their support for Plaintiff's candidacy, and during the same time period in which Commissioner Deon met with Senator Hughes and was called into a private meeting with Senator Tartaglione." (Doc. 61-1, at 19).

Savage thus argues that the lack of evidence of any connection between the 2013 grand jury indictments and the change in the Code of Conduct prohibiting Commission employees from becoming candidates for State or Federal office, together with the temporal proximity of the addition of a prohibition against Commission employees becoming candidates for public office to the Code of Conduct on November 1, 2013, the phone calls made by Senator Hughes before Plaintiff's October 23, 2013 fundraiser, and Commissioner Deon's meetings with Senators Hughes and Tartaglione seeking reappointment to his post, all "could lead a reasonable jury to conclude that Defendant made that change in the Code

of Conduct to prevent Plaintiff from challenging Senator Tartaglione for her Senate seat or to punish him for doing so. (*Id.*). Plaintiff therefore argues that there are genuine disputes of fact as to what motivated the Commission's decision to change the Code of Conduct to prohibit employees from becoming candidates for public office so that Defendant's motion for summary judgment must be denied.

Plaintiff additionally argues that the evidence shows a close temporal proximity and a pattern of antagonism with respect to the Plaintiff's political activities. He asserts that within days of announcing his first fundraiser for the State Senate race on July 18, 2013, he received an email from the Commission's attorney with respect to allegations that he may have been using his Commission vehicle for political purposes even though, Savage asserts, he did not have a Commission vehicle at the time and his use of any Commission vehicle would be logged. (*Id.* at 20).

Further, Savage argues that the pattern of antagonism is shown by the events of July 19, 2013, where Savage's "superior" Robert Brady, while both were attending a fundraiser for a Philadelphia City Councilman, showed him an email that he had received from Commission COO Shuey, expressing Shuey's extreme displeasure with an article in the *Philadelphia Daily News* regarding Savage's candidacy for State Senate against Senator Tartaglione. (*Id.*). This pattern of antagonism, Plaintiff asserts, continued with the telephone calls made by Senator Hughes to three of the hosts of Plaintiff's fundraiser at the Palm Restaurant on October 23, 2013. Those individuals, Sheppard, Santarelli, and

McClure, testified by deposition and Plaintiff characterizes each of them as having considered the statements made to them by Senator Hughes as implicitly threatening or hostile. (*Id*. at 20-21).

Finally, Savage argues that his termination was "constitutionally offensive" because the policy which contained the prohibition against a Commission employee running for public office was not formally published to the Commission's employees before it was used to terminate Savage's employment. (*Id*. at 22).

In reply, the Commission first takes issue with the "sword and shield" argument raised by Plaintiff as to the communications which the Commission has asserted are covered by the attorney-client privilege. (Def.'s Reply Br., Doc. 65, at 3). The Commission argues that it properly asserted the attorney-client privilege over communications which occurred during Executive Sessions of Commission meetings where the Commission's counsel provided legal advice about the revised Code of Conduct, including the revisions to the policy regarding employee political activity. The Commission states that Plaintiff never argued that these communications were not privileged or filed a motion to compel their production. (*Id*. at 3). The Commission thus argues that Plaintiff's objections made in his brief in opposition to Defendant's motion for summary judgment are untimely and should have been the subject of a motion to compel or a motion for sanctions. (*Id*. at 4). In addition, the Commission argues that even if Plaintiff's argument were timely, it is legally and factually incorrect. The Commission flatly states that it "has never asserted 'advice of

counsel' as a defense, and never relied on privileged communications (appropriately shielded from disclosure) as the reason behind the Policy." (*Id.* at 4). Instead, the Commission reasserts that its defense in this case is based on "its decision to review its policies, and its adoption of the Policy (and other policies), following the presentment." (*Id.*). It accordingly finds that the cases cited by Plaintiff are inapposite. (*Id.*).

Moreover, the Commission emphasizes that Plaintiff was allowed to question Commission CEO Mark Compton at length concerning the adoption of the prohibition on Commission employees running for public office and, in particular, his reasoning for the necessity of such a prohibition. (Doc. 65, at 5-6). With regard to the "reasonable necessity" for the prohibition upon Commission employees becoming candidates for State or Federal office, the Commission urges this Court to reject Plaintiff's argument that a genuine dispute of fact exists as to the reason for the Commission's adoption of the resign-to-run rule. It further urges this Court to reject Plaintiff's contention that the Commission limited CEO Compton's review to the kinds of procurement issues which were cited in the grand jury presentment. (*Id.* at 9). Instead, the Commission argues that "[c]ertainly, procurement issues were part of the reform effort – as shown in several of the other reforms made to the Code of Conduct . . . but Compton's charge was broader, as Commissioner Deon's FMLA example demonstrates." (*Id.*).

The Commission asserts that it is "undisputed that Compton began the policy review process in April 2013, before anyone knew about Plaintiff's intention to run for office, when

he asked Stacia Ritter, then the Commission's Director of Government Affairs, to conduct research on the different kinds of codes of conduct in effect at other Pennsylvania agencies." (*Id*. at 9).  The Commission argues that Ritter in April of 2013 produced a chart and memorandum explaining the different codes of conduct at various agencies and that Ritter, in her memorandum, listed as among the items for discussion:

> PTC Code of Conduct does not address political activity of employees (only Members and Executive Level Employees)

(*Id*. at 10).  Thus, the Commission argues that the Ritter memorandum pre-dated any announcement by Savage of his intention to run for office and "identifies employee political activity as an area to be considered for reform." (*Id*.).  The Commission then once more makes reference to the testimony of CEO Compton as justification for the addition of the prohibition on Commission employees running for public office, specifically his stated fear that elected officials in Pennsylvania would "park" employees at the Commission between campaigns for public office.  (*Id*.).

The Commission also takes issue with Plaintiff's claim of a temporal proximity between his alleged protected activity and his termination, stating that while Plaintiff indicated his intention to run for Senator Tartaglione's seat as early as July 2013, his employment was not terminated until March 2014, some eight months later.  (Doc. 65, at 12).

Nor, in the view of the Commission, has Savage shown facts raising a dispute for trial as to whether there existed a pattern of antagonism with respect to Plaintiff in a time period relevant to his campaign and candidacy for State Senate.  With respect to the inquiry

as to Plaintiff's use of a Commission vehicle, the Commission responds that it was not an adverse employment action and that instead "he was simply reminded to comply with the generally applicable policy and there were no negative consequences to him." (*Id.* at 13).

The Commission also again asserts that Savage's testimony regarding Robert Brady, Jr. having shown him an email where Commission COO Shuey allegedly expressed "extreme displeasure" with an article in the *Philadelphia Daily News* which discussed Savage's anticipated run for office is inadmissible under the best evidence rule and presents inadmissible hearsay which cannot be considered by this Court on summary judgment. (*Id.* at 14).

In addition, the Commission argues that, with respect to the November 1, 2013, draft of the Code of Conduct in which, for the first time, the prohibition against Commission employees becoming candidates for office was included, "Plaintiff offers no evidence that anyone involved in adding the Policy had any knowledge of his October fundraiser, and it is undisputed that Senator Hughes never spoke to anyone at the Commission and did not even know where Plaintiff worked." (*Id.* at 15).

The Commission summarizes much of its argument in support of its request for summary judgment on the issue of political discrimination and retaliation as follows:

> Plaintiff fails to identify a single piece of evidence that anyone opposing his Senate run ever even spoke to or anyone at the Commission about him or that these actions were in any way connected to the termination of his employment. Both Senators Hughes and Tartaglione testified they have never spoken to anyone at the Commission about Plaintiff, and Plaintiff has offered

> no evidence to the contrary. . . . Plaintiff offers no factual evidence for his
> denial of this fact, and it should therefore be deemed admitted.

(*Id*. at 15-16).

The Commission dismisses Plaintiff's argument that Senator Hughes engaged in the making of threatening phone calls to Savage's supporters and hosts of his fundraisers, arguing "Senator Hughes simply called Santarelli and others to encourage them to support Senator Tartaglione over Plaintiff, just as Plaintiff's supporters, like Santarelli, called people and encouraged them to support Plaintiff." (*Id*. at 16). The Commission concludes that "Plaintiff has not shown that there was anything other than ordinary campaign activities by Senator Tartaglione or her supporters, nor is there any evidence linking these campaign activities with the Commission." (*Id*.).

## B. The "Reasonable Necessity" Requirement for the Adoption of the "Resign-To-Run" Addition to the Commission's Code of Conduct.

The Code of Conduct adopted on January 7, 2014, contains the following provision in § 9.3 of Section IX "Public Office and Party Affiliation":

> No Executive-Level employee or Employee shall be a candidate for nomination or election to any State or Federal Office unless he or she shall have first resigned from his or her employment with the Commission. State Office shall be deemed to include the following offices in the Commonwealth of Pennsylvania: Governor, Lieutenant Governor, Attorney General, Auditor General, State Treasurer, Senator and Representative in the General Assembly, and Judge or Justice of any Court of the Commonwealth, including Magisterial District Court and Municipal Court. Federal Office shall be deemed to include Senator and Representative in the United States Congress.

(Doc. 54-11, Ex. 16; *see also*, DSOF, at ¶ 35).

On review of the summary judgment record, the Commission has failed to show the absence of a genuine dispute of material fact as to whether its enactment of the resign-to-run rule is justified by reasonable necessity.

As this Court stated in its Memorandum Opinion denying the Commission's motion to dismiss, the "threshold issue before the Court in this case [is] whether Savage's First Amendment interest in being a candidate for public office is outweighed by those of the Turnpike Commission." (Doc. 22, at 18). In so ruling, this Court relied upon the decision of the Fifth Circuit in *Phillips v. City of Dallas*, wherein the Court, quoting its prior decision in *Morial v. Judiciary Commission of State of Louisiana*, 565 F.2d. 295 (5th Cir. 1977), stated that "[r]estrictions on the partisan political activity of public employees and officers are constitutionally permissible if justified by a reasonable necessity to burden those activities to achieve a compelling public objective," 781 F.3d. 772, 779 (5th Cir. 2015). (Doc. 22, at 18).

The Commission advances three bases for its adoption of the resign-to-run rule.

First, the Commission argues that as a result of the indictment in March of 2013 by the Commonwealth of Pennsylvania of several former Commission employees, including the Commission's former CEO and a former Commissioner, revisions to its Code of Conduct were necessary. Accordingly, Mark Compton, who became the Commission's CEO in February of 2013, was charged with the review of all of the Commission's policies and to propose what the Commission describes as "meaningful reforms" to prevent the type of conduct which led to the grand jury indictments from happening again and to restore the

Commission's reputation. Thus, the Commission argues that the addition of the prohibition upon Commission employees from becoming candidates for public office without first resigning employment with the Commission was the direct result of the Commission's efforts to reform itself to eliminate the kind of conduct that led to the March, 2013, indictments.

While neither party put of record the grand jury presentment, the parties agree that the presentment accused several executives and managers employed by the Commission of illegal procurement practices. On this point, Mark Compton's deposition testimony is instructive:

**Q**: What was the presentment about?

**A**: The presentment was about procurement practices within the commission. It was also about one or two of the employees lost time, ghost employee type stuff.

**Q**: So it didn't deal with political activity. It was dealing more with the activities of the persons on the job.

**A**: With influence from political people.

(Dep. of Compton, at 60:1-13). Compton also testified that the grand jury presentment addressed "political givings through different vendors and things like that as well." (*Id.* at 62:9-11).

Further, when asked whether there was any suggestion that Savage, at any time during his employment with the Commission, had engaged in any activity where he had

taken money or taken gifts from anyone as an employee of the Commission, Compton answered "not that I'm aware." (*Id*. at 62:22-63:4).

While the grand jury presentment may well have been the basis for the Commission's overhaul of its procurement practices, vendor relationships and rules regarding whether Commission employees may receive anything of value from a Commission vendor, by Mr. Compton's own testimony, it did not arise out of or have any connection with Commission employees becoming candidates for elected office. Indeed, Plaintiff argues the complete absence of any nexus between the grand jury indictments of March of 2013 and the Commission's ultimate adoption in January of 2014 of the resign-to-run rule found in Section 9.3 of the Code of Conduct. Whether the Commission was motivated to adopt the resign-to-run rule because of the grand jury indictments of former Commission employees including a Commission CEO and Commissioner, presents a material dispute of fact for trial.

Second, the Commission states that it appointed an independent Advisory Committee which reviewed all of the Commission's policies over a period of 18 months and issued a report recommending further actions to "minimize or eliminate undesirable practices cited in the presentment." (Doc. 54-15, at 4 n.3). Appendix A of the Advisory Committee report (Doc. 61-23, Ex. 61), entitled "Roles and Responsibilities of the Advisory Committee", sets forth the Committee's purpose as follows:

> To review and critique current Turnpike policies and procedures relating to contracting and other business practices to see where continued

improvements can be made and to research best-practices at comparable agencies to learn from experiences and protocols.

(*Id*. at A1).

Further, the responsibilities of the Advisory Committee are set forth as follows:

The Advisory Committee shall:

- Review existing contracting policies and procedures and provide guidance on ways to further enhance the quality, efficiency and accountability of Commission contracting methods.

- Review the Commission's process and key findings for the current and ongoing contract audits.

- Advise the Executive Staff as to potential improvements with the above-described policies, procedures and audits.

- Review and endorse if appropriate the Commission's Integrity Agreement for all business partners.

- Review and monitor the steps taken by the Commission to ensure the employees of the Commission understand and adhere to the Code of Conduct.

(*Id*.).

Appendix B of the Advisory Committee's report contains a chart which is divided into three columns, entitled "Grand Jury Presentment", "PTC Actions", and "Status", respectively.  (*Id*. at A2).

Under the column Grand Jury Presentment are listed in bullet point form what the Advisory Committee apparently deemed to be the subject matters covered by the grand jury presentment.  They are listed as follows:

- Improper influence by Commissioners and Executives on the awarding of contracts.

- Failure to report gifts, hospitality, and other relevant financial interests on requisite financial disclosure forms from 2003-2010.

- Conflicts of interest in regards to procurement of contracts.

- Political fundraising by Commission officials.

- Use of Commission resources for personal use.

(*Id.*). None of these statements of the subject matters viewed by the Advisory Committee as having been the types of conduct addressed by the grand jury presentment include any reference to Commission employees becoming candidates for public office.

Moreover, within the column "PTC actions", none of the actions cited by the Advisory Committee as having been taken by the Commission relate to the adoption of a prohibition on Commission employees becoming candidates for office unless such employee has tendered his/her resignation. While there is a statement that the Commission "[s]trengthened Code of Conduct and expanded applicability of conflict of interest provision" as it relates to the listed grand jury presentment's subject of "[p]olitical fundraising by Commission officials", at best, this ambiguous statement, to the extent that it is advanced by the Commission as justification for its resign-to-run policy, presents an issue for trial.

Further, the Advisory Committee's recommendations are general in nature and do not specifically address the subject matter of whether Commission employees should be prohibited from becoming candidates for State or Federal office unless having first resigned

their employment. (*See* Doc. 61-23, P-61, at 1). In fact, the recommendations begin with

this paragraph:

> In response to Grand Jury Presentment of March 2013, the Pennsylvania Turnpike Commissioners directed Chief Executive Mark Compton to establish an Advisory Committee to seek opportunities to minimize or eliminate undesirable practices *cited in the presentment.*

(*Id.*) (emphasis added). The Executive Summary & Recommendations next states:

> In July 2013 the PTC established the Advisory Committee to review and evaluate current PTC policies and procedures relating to contracting and other business practices, to identify where continuous improvement can be made and to search best-practices at comparable agencies.
>
> Immediately thereafter, the Advisory Committee immersed themselves in learning and understanding the PTC's procurement and contracting policies and procedures, national best-practices and the PTC's ongoing and planned reforms through numerous meetings, interviews, presentations by PTC staff, one-on-one meetings with commissioners and executive staff and review of numerous documents.
>
> Based upon studies, observations and professional experience of its members, the Advisory Committee makes the following recommendations:
>
> 1. Strengthen the ethics training requirements at the PTC for employees, consultants, construction contractors, vendors and other business partners.
>
> 2. Enhance the process for evaluating the procurement of professional services and construction contracts to provide greater transparency and accountability.
>
> 3. Establish a procedure for periodic reviews of policies and procedures for continuous improvement purposes.
>
> 4. Improve transparency of business practices through more robust public outreach.

5. Institutionalize improvements by adopting all recommendations as part of the PTC Policy Manual.

6. Establish a policy for continual implementation of these recommendations, including a process for participation of an independent advisory person or group.

7. Prepare succession planning for key PTC positions, particularly for the chief operating officer, chief engineer and all department heads.

8. Develop a structured transition process for new commissioners and CEO.

9. Establish vision, mission, goal, objective and values for PTC to institutionalize recently implemented ethics, integrity, transparency and quality of services.

10. Continue to promote and make best use of initiatives to minimize overlap of common operational activities such as training and co-locating maintenance sites with PennDOT.

(*Id.*).

Again, the Advisory Commission's recommendations as well as its description of the subject matters to be addressed which arose from the grand jury presentment do not undeniably relate to or address the issue of Commission employees becoming candidates for office or the need, or value, of a prohibition upon Commission employees doing so. Therefore, whether the Advisory Committee report establishes or tends to establish the requisite reasonable necessity for the resign-to-run rule enacted by the Commission on January 7, 2014, likewise presents a factual determination for a jury.

Third, the Commission presents the testimony of its CEO, Mark Compton, to establish the reasonable necessity for the prohibition upon Commission employees

becoming candidates for office unless they have resigned. Compton testified that the policy

prohibiting employees from becoming candidates for office was his idea, stating:

> [M]y biggest fear is that the Senate or the House would ask us to house
> somebody in order for them to run for office. I didn't want us to be the
> housing entity for anyone to hang out to run for office. I wanted to have really
> the same process in place that I knew at PennDOT.

(Dep. of Compton, at 71:20-72:3). Compton explained that, before he had started his

employment with the Commission, in February of 2013 "someone" at the Commission had

run for a state judgeship position in Western Pennsylvania and was preparing to leave the

Commission after he had been elected, which prompted him to think about the

Commission's policy in that regard. (Id. at 63:21-64:20). Savage has responded by noting

that the September 27, 2013, draft of the Code of Conduct did not include any prohibition

against Commission employees running for office. Nor did the revised Code of Conduct

presented to the Commissioners on October 11, 2013, contain any change to the existing

Code policy permitting Commission employees to become candidates for public office. In

addition, Plaintiff notes the testimony of Compton that he was not aware of any State

legislators placing pressure on the Commission to hire people:

> **Q**: During your tenure, were you aware of anybody who was intending to
> run for office being pushed to become an employee of the
> commission?
>
> **A**: No.

(Dep. of Compton, at 74:15-19).

Thus there exists a genuine dispute for trial as to whether the enactment of a prohibition upon Commission employees becoming candidates for State or Federal office was reasonably necessary as a result of the March 2013 grand jury indictments of former Commission employees, the recommendations of the independent Advisory Committee formed in the wake of the grand jury indictments, or because of the "fear" of CEO Compton that State elected officials would pressure the Commission to "house" an individual in order to enable them to run for office. There is also a genuine dispute of fact for trial as to whether any of the justifications offered by the Commission present the true reasons for the enactment of the prohibition on Commission employees becoming candidates for State or Federal office unless they first resign. This is so because Compton's testimony places his credibility at issue and it is axiomatic that a court may not assess credibility in determining whether to grant or deny summary judgment. *See Guidotti v. Legal Helpers Debt Resolution, LLC.*, 716 F.3d 764, 772 (3d Cir. 2013) ("In evaluating the [summary judgment] motion, 'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'") (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). *See also, Doeblers' Penn. Hybrids, Inc. v. Doebler,* 442 F.3d 812, 820 (3d Cir. 2006) (stating that credibility determinations "are inappropriate to the legal conclusions necessary to a ruling on summary judgment. . . . A District Court should not weigh the evidence and determine the truth itself, but should instead determine whether there is a

genuine issue for trial."); *J.F. Feeser, Inc.*, 909 F.2d at 1531 ("We are keenly aware that credibility determinations are not the function of the judge; instead the non-movant's evidence must be credited at this stage.").

Significantly, that the September 26 and October 11, 2013 drafts of the Code of Conduct did not include a prohibition against Commission employees from becoming candidates for State or Federal office while the November 1, 2013 draft, for the first time, did include such a prohibition, raises a further dispute of fact as to the reasons why such a prohibition was added on November 1, 2013, and whether it was indeed reasonably necessary.

For these reasons, whether the prohibition upon Commission employees from running for State or Federal elective office as enacted by the Commission on January 7, 2014, was reasonably necessary is a material dispute for trial.

In so ruling, this Court believes it necessary to address Savage's argument that the Commission has improperly used the attorney-client privilege and executive privilege as both "a sword and shield" so that, in effect, Plaintiff has been prevented from learning the "true motive" for the Commission's enactment of the resign-to-run rule while at the same time the Commission has come forward with carefully limited explanations justifying its actions. As previously discussed, the Commission disputes Plaintiff's characterization of its assertion of attorney-client privilege and states that it has not asserted "advice of counsel" as a defense in this case and has never relied on privileged communications as the reason

behind the prohibition upon Commission employees becoming candidates for office without resignation. The Commission contends that the cases Plaintiff relies upon are inapposite as they relate to the assertion of the advice of counsel defense while the party asserting that defense also withholds discovery pertaining to that advice. (Doc. 65, at 4).

On review of the cases cited by Plaintiff, the Court concludes that Defendant's assertion of the attorney-client privilege to preclude Plaintiff's counsel from questioning Commission employees with respect to matters discussed with Commission counsel or during executive sessions of the Board of Commissioners at which counsel was present does not warrant the sanction sought by Plaintiff, *i.e.*, a ruling that the Commission "cannot argue or present any evidence that the prohibition of running for office while employed is 'reasonably necessary'" (Doc. 61-1, at 17). Thus far, the Commission has not attempted to protect certain communications of Commission employees under a claim of attorney-client privilege while at the same time selectively asserting defenses based on privileged communications as was the case in *Yarnell v. Philadelphia School District*, 57 F.Supp.3d 410, 431 n.15 (E.D. Pa. 2014). Nor has the Commission engaged in conduct which may be fairly said to have used the attorney-client privilege as both a sword and shield as that term is described in *Murray v. Gemplus International, S.A.*, 217 F.R.D. 362 (E.D. Pa. 2003):

> As many courts have noted, the attorney-client privilege is a shield used to protect communications, not a sword wielded to gain an advantage in litigation. [*In re Leslie Fay Cos., Inc. Sec. Litig.*, 161 F.R.D. 274, 282 (S.D.N.Y. 1995)]; *Valenti v. Allstate Ins. Co.*, 243 F.Supp.2d 200, 220 (M.D. Pa. 2003)("Counsel is reminded that privilege is a shield not a sword."). Where one party attempts to utilize the privilege as an offensive weapon,

selectively disclosing communications in order to help its case, that party should be deemed to have waived the protection otherwise afforded it by the privilege it misused.

217 F.R.D. at 367. Here, the Court cannot say that the Commission has selectively disclosed privileged communications in order help its case and thus the Court rejects the Plaintiff's claim of waiver of the privilege protection.

However, the Court's discussion in *Impala Platinum Holdings Limited v. A-1 Specialized Services and Supplies, Inc.,* 2017 WL 960941 (E.D. Pa. 2017) is instructive should the Commission, in connection with the trial of this matter, expressly or by reasonable implication, assert the defense of reliance on the advice of counsel in support for the enactment of the January 7, 2014, prohibition on any Commission employee becoming a candidate for State or Federal office, or in support of any other defense, specifically including a defense that Plaintiff's termination was for legitimate, non-discriminatory reasons and free of any political animus toward him. This Court in the appropriate circumstance will fashion a remedy to prevent surprise and unfairness to the Plaintiff which may include prohibiting any Commission employee or other witness from testifying on matters thus far claimed by the Commission to be privileged. *Impala Platinum Holdings,* 2017 WL 960941 at *2. Similarly, should the Commission selectively disclose communications that thus far have been shielded by the Commission's counsel by the assertion of the attorney-client privilege, the Commission may be deemed to have waived the protection otherwise afforded to it by the privilege for all such communications.

Simply stated, should the Commission place at issue its reliance upon the advice of counsel as part of its defense in this case or attempt to selectively present testimony or other evidence that discloses privileged communications as to which Savage was barred from inquiry during discovery, the Court may consider such conduct as a waiver of the attorney-client privilege generally.

## C. Plaintiff's Claim of Political Discrimination and Retaliation in Violation of the United States Constitution and the Pennsylvania Constitution.

In assessing whether the Commission is entitled to summary judgment with respect to this claim, this Court begins with the Third Circuit's observation in *Goodman*. There, the Court summarized what it termed the "political patronage trilogy":

> The Supreme Court has decided a trilogy of cases that governs our decisions in political patronage cases. In *Elrod v. Burns,* 427 U.S. 347, 372-73, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and again in *Branti v. Finkel,* 445 U.S. 507, 514-15, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court ruled that public agencies may not constitutionally discharge employees based on their political affiliation when those employees' positions are neither policymaking nor advisory. *See Stephens v. Kerrigan,* 122 F.3d 171, 176 (3d Cir. 1997). It reasoned that an employee's First Amendment right outweighs the Government's interest in maintaining a system of political patronage.

*Goodman*, 293 F.3d at 663. The Court in *Goodman* then addressed what it termed the "third leg" of the political patronage trilogy, which was "added" by the Supreme Court in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). *Id.* The Court in *Goodman* explained:

> In *Rutan,* the Supreme Court extended *Branti* and *Elrod* and ruled that promotions, transfers, recalls, and hiring decisions involving public employees may not be based on party affiliation and support unless the Government can

show that party affiliation is an appropriate requirement for the position involved. *Rutan,* 497 U.S. at 75, 110 S.Ct. 2729.

*Id.*

In *Robertson v. Fiore*, the Third Circuit distilled from the decisions in *Elrod, Brantee*, and *Rutan*, a test for determining claims of discrimination based on political association:

> To make out a claim of discrimination based on political association, a public employee must prove (1) that the employee works for a public agency in a position that does not require a political affiliation, (2) that the employee maintained an affiliation with a political party, and (3) that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision. . . . If the employee demonstrates these elements, the employer may avoid a finding of liability by demonstrating by a preponderance of the evidence that it would have made the same decision even in the absence of the protected affiliation.

62 F.3d. 596, 599 (3d Cir. 1995) (citations omitted).

In addition to stating the test by which political discrimination must be determined, the Court also made clear that the protection of the expression or exercise of political beliefs enjoys no less protection when the expression or exercise results in an employee supporting a different faction within the same party:

> The danger that employees will abandon the expression or exercise of their political beliefs to appease their supervisors is not diminished because a supervisor supports a different identifiable faction within a party as compared to a different party altogether. *Tomczak v. City of Chicago,* 765 F.2d 633, 640 (7th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985). Whenever an employee, whose position does not require political decision making, yields his political will to his superior, the political process is harmed whether the employee is of the same or a different party.

*Id.* at 600.

Accordingly, the Court concluded:

> Where, as here, a public employee is associated with an identifiable political faction within a single party, we need not be concerned that his activities were not legitimately political or legitimately divisive.

*Id.*

The test for determining the existence of political discrimination set forth in *Robertson* has been consistently employed by the courts in this circuit. *See e.g.*, *Goodman*, 293 F.3d at 663-664; *Galli*, 490 F.3d at 271; *Gulick*, 995 F.Supp.2d at 332.

Here, there is no dispute that Plaintiff Savage was employed at a public agency that does not require political affiliation and that he was engaged in constitutionally protected conduct by seeking election to the Pennsylvania State Senate and engaging in campaigning in support of his candidacy. Thus the question before the Court is whether there is a triable dispute of fact as to whether his conduct was a substantial or motivating factor in the Commission's decision to enact a rule prohibiting a Commission employee like Plaintiff from becoming a candidate for State or Federal office without first resigning his employment, and terminating him pursuant to that rule. "'Implicit in this prong is a requirement that the plaintiff produce sufficient evidence to show that the defendant knew of the plaintiff's political persuasion,' which requires proof of both knowledge and causation." *Galli*, 490 F.3d at 275 (quoting *Goodman,* 293 F.3d at 664).

The knowledge of the Commission, through its representatives, of Savage's political activity, specifically his commencement of campaign activities in support of his candidacy

for State Senate, is undisputed. It is undisputed that Plaintiff testified that he informed co-workers at the Commission of his impending run in June of 2013 and that he held his first "kickoff" fundraiser in July of 2013. (*See* DSOF, at ¶ 51). It is likewise undisputed that Commission CEO Compton and Commission COO Shuey became aware that Savage was considering a potential run for State Senate in the summer of 2013. (*Id*. at ¶ 52).

Commission CEO Compton testified that he was aware of Plaintiff's interest in running for office in the period between July 2013 and the end of 2013, testifying:

**Q**: . . . [W]ere you aware in the period between July 2013 and the end of that year that Mr. Savage had announced his candidacy held by Ms. Tartaglione?

**A**: I'm not sure I would use the term announced, but I certainly was aware there was interest.

**Q**: How did you become aware of that interest?

**A**: Press reports.

**Q**: Other than press reports, did you have any discussions with anybody about his running for or intending to run for this position?

**A**: Only I think related to concerns of perhaps doing it on commission time.

(Dep. of Compton at 31:16-32:9).

Similarly, COO Shuey testified:

**Q**: Did there come a time when you had discussions with people in 2013 about Danny Savage running for office?

**A**: I did at one point in time with Doreen McCall.

(Dep. of Shuey, at 21:22-22:2).  Shuey further testified:

> **Q**:    How did you learn that Danny was running for office?
>
> **A**:    I believe I read it in the newspaper.

(*Id*. at 22:19-22).  In addition, Shuey testified he had conversations with Commission counsel McCall regarding Savage's use of a vehicle while campaigning.  (*Id*. at 43:18-22).

While Commissioner Deon testified that he did not "recall" ever discussing with "anybody" Savage's run for office, his testimony may not form the basis for a grant of summary judgment in that, once again, this Court is precluded from assessing the credibility of witnesses as explained earlier herein.  *See also, Goodman,* 293 F.3d at 665 ("As with grants of summary judgment, the reviewing Court 'must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence.'").

With the admissions of Commission CEO Compton and COO Shuey of their knowledge of Plaintiff's political activities in connection with his run for the State Senate, the knowledge of the Commission has been sufficiently established.  Analytically then, the Court must determine whether there are genuine disputes of fact for trial as to causation.  That is, Savage must produce sufficient evidence from which a reasonable trier of fact could conclude that his campaign for the Democratic nomination for State Senator was a "substantial or motivating factor" in the adverse employment action.  *See Galli,* 490 F.3d. at

276. Savage has asserted that he was discharged in retaliation for his First Amendment exercise of free association and speech. In the context of such claims:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. . . . In the absence of that proof the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.

*Lauren W.,* 480 F.3d at 267 (internal citations and quotation marks omitted).

Here, the Court finds Plaintiff has shown the requisite "unusually suggestive temporal proximity" between the protected activity of his campaigning for the Democratic nomination for State Senator and the allegedly retaliatory action of the Commission, wherein it formulated, for the first time, on November 1, 2013, a draft prohibition against a Commission employee becoming a candidate for State or Federal office. It is noteworthy that the Commission, in its revisions to the Code of Conduct as part of its overall review of the Code of Conduct as a result of the grand jury indictments of former Commission employees, prepared drafts of the Code of Conduct on or around September 26, 2013, and again on October 11, 2013, in which no change to the existing Code was made to add a prohibition against Commission employees becoming candidates for State or Federal office without first resigning. It is undisputed that the policy containing the prohibition against a Commission employee running for public office was not added to the Code of Conduct until the November 1, 2013, draft. Meanwhile, during the months of October and November, Savage openly continued his fundraising efforts. More specifically, Plaintiff has raised a

genuine dispute of material fact by asserting that the "prohibition was only added in the November 1, 2013 draft that was issued a week after Plaintiff's October 23, 2013 fundraiser and Senator Hughes' unsuccessful attempts to threaten the hosts of that fundraiser into withdrawing their support for Plaintiff's candidacy, and during the same time period in which Commissioner Deon met with Senator Hughes and was called into a private meeting with Senator Tartaglione" (Doc. 61-1, at 19).

Further, this temporal proximity is augmented by exhibited antagonism toward Savage where the record evidence shows that after announcing his first fundraiser for the State Senator race on July 18, 2013, Plaintiff received an email from the Commission's attorney with respect to allegations that Plaintiff may have been using his Commission vehicle for political purposes. (*Id.* at 20). There is also the disputed exchange as to whether Plaintiff, while attending a fundraiser for a Philadelphia City Councilman on July 19, 2013, was shown an email by Brady, which Brady allegedly received from COO Shuey purportedly expressing Shuey's extreme displeasure with an article in the *Philadelphia Daily News* with respect to Savage's candidacy for State Senate against Senator Tartaglione.

In addition, genuine disputes of fact arise with respect to Commissioner Deon and Senator Tartaglione regarding Deon's confirmation for another term as Turnpike Commissioner. There, Commissioner Deon testified that when he met with Senator Tartaglione concerning his confirmation as Turnpike Commissioner, he did not discuss

Savage. (Dep. of Deon, at 44:13-16). However, Commissioner Deon also testified at his deposition as follows:

> **Q**:    How long did you meet with Senator Tartaglione?
>
> **A**:    Maybe 15 minutes.
>
> **Q**:    What did you discuss during that conversation?
>
> **A**:    I don't recall.

(*Id*. at 12:24-13:5).

Commissioner Deon's seemingly irreconcilable testimony as to his meeting with Senator Tartaglione creates a genuine dispute of fact for trial, wholly apart from any question of his credibility, an assessment of which is beyond this Court's function at the summary judgment stage. It is undisputed that Commissioner Deon's meeting with Senator Tartaglione was arranged by Stacia Ritter of the Commission and that Deon came to ask Senator Tartaglione for her vote for confirmation. (Dep. of Tartaglione, at 21:4-17). Senator Tartaglione testified her meeting with Commissioner Deon was in November of 2013 for approximately 20 minutes. (*Id*. at 21:18-22:2). Senator Tartaglione acknowledged that she was aware that Senator Hughes and Senator Costa were engaged in making phone calls to persons who were supporting Plaintiff Savage although she did not know what the nature of those phone calls was. (*Id*. at 26:3-10). She further denied ever having a discussion with Commissioner Deon concerning Daniel Savage. (*Id*. at 33:9-12).

While Senator Vincent Hughes testified that he did not recall making phone calls to individuals who were supporting Savage, specifically Frederick Santarelli, Shannon McClure Roberts, and Mark Sheppard (Dep. of Hughes, at 30:1-31:16), each of these individuals testified that Senator Hughes contacted him or her by telephone.

Santarelli testified that he received a telephone message from Senator Hughes on October 17, 2013, in the form of a voice mail which was recorded and saved by Santarelli. (Dep. of Santarelli, at 14:15-16:14). Santarelli testified that he called Senator Hughes back and that Senator Hughes told him:

> . . . that I understand you are supporting Dan Savage for Senate and I want you to know that we in the Democrat Caucus in the Pennsylvania Senate do not support Dan Savage and that we support Tina Tartaglione and I would ask you to support Tina over Dan Savage.

(*Id.* at 16:16-21). Santarelli further testified that he did not know Senator Hughes and that Senator Hughes indicated that he knew Santarelli was to host a fundraiser for Savage. (*Id.* at 16:23-17:5). Santarelli testified that he viewed the phone call:

> as an attempt to unduly influence me to do something I didn't want to do. So if you call that a threat, whatever. Like I said, I don't know Senator Hughes. I know he's a powerful man. I know of him. He is a leader in the State Senate. And, you know, in my business I don't like to – I don't want to say I felt threatened by anybody, but sure he is a powerful man and I felt like he was trying to influence me.

(*Id.* at 19:8-16).

Shannon McClure-Roberts likewise testified that Senator Hughes called her personally. She testified:

> . . . He identified himself. Identified the fact that he was calling to discuss my planned support or hosting of this upcoming fundraiser at The Palm for Danny Savage. He advised me that Danny was running against the incumbent Democratic Pennsylvania State Senator Tina Tartaglione. I believe that's her name. And suggested that it would be a good idea if I did not support Danny's campaign and I did not host this upcoming fundraiser because doing so would mean that the Democratic party would have to devote time, money and resources to a primary and the Democratic party's money would be better spent in statewide – contesting Republican seats or contesting, you know contested elections. And that it wasn't a good idea for the Party to spend money or the Party to have to devote resources to a primary campaign.

(Dep. of McClure-Roberts, at 13:16-14:8). McClure-Roberts testified that she found the conversation to be "condescending, demeaning and offensive." (*Id*. at 14:24). She further testified that the suggestion that she should change what she was doing "in terms of fundraising or political activity", was to her, implicitly threatening. (*Id*. at 16:1-7).

Mark Sheppard was asked by Savage to co-host a fundraiser to raise money for his campaign. (Dep. of Sheppard, at 6:10-19). The fundraiser Sheppard was to co-host was in October of 2013. (*Id*.). Sheppard testified that he received a telephone call from Senator Hughes before that fundraiser in which Senator Hughes "expressed his disappointment clearly to me that I should not be involved in this and asked me not be involved in this." (*Id*. at 10:7-12). Sheppard further testified that he recalled Senator Hughes:

> saying something to the effect of, you would not like it if someone were challenging Senator Andrew Dinniman, who was also a sitting Senator. My wife worked for Senator Dinniman and was his District Office Manager at the time. The implication being that, at least I took it, as some kind of veiled threat regarding my wife's continued employment with the caucus, the Democratic caucus.

(*Id*. at 10:13-20). When asked whether Senator Hughes made a specific threat as to his continued support of Savage, Sheppard responded:

> No, he didn't have to. The message was, I thought, pretty loud and clear. And it was received. . . .
>
> You know, I took the comment about Senator Dinniman and my wife very seriously. And, you know, I was concerned but not concerned enough to say that I'm going to drop my support for Mr. Savage. And I made it clear that I wasn't.

(*Id*. at 10:21-11:16). Sheppard did not recall Senator Hughes mentioning anything about the Pennsylvania Turnpike Commission. (*Id*. at 11:17-18).

Whether Senator Hughes made these telephone calls to Santarelli, McClure-Roberts, or Sheppard, and, if so, whether the substance of the conversations was as related by each of them is clearly in dispute. What is also in dispute is whether these calls have any relationship to the Commission's preparation of a draft on November 1, 2013, which, unlike the prior drafts of September 26, and October 11, 2013, contained a prohibition against Commission employees becoming candidates for office without resignation. Given the temporal proximity of these phone calls to the November 1, 2013, draft of the prohibition on Commission employees becoming candidates for elective office which ultimately was enacted by the Commission on January 7, 2014, as well as the antagonism that Savage argues is shown by such phone calls toward his candidacy, a reasonable jury could conclude that there was sufficient temporal proximity between the November 1, 2013, draft of the prohibition on Commission employees running for office and Plaintiff's October 23, 2013, fundraiser at The

Palms Restaurant in Philadelphia and such telephone calls as Senator Hughes may have made as recounted by Santarelli, McClure-Roberts, and Sheppard that Daniel Savage was subjected to unlawful discrimination and was retaliated against in violation of the First Amendment for becoming a candidate for State Senate and engaging in campaign activities in connection with that campaign.[5] Alternatively, a reasonable jury could decline to draw such inferences and make credibility determinations that support the Turnpike Commission's position that no such discrimination or retaliation took place. But these are, for all the foregoing reasons, matters that can only be resolved at trial.

## V. CONCLUSION

For the foregoing reasons, the Commission's Motion for Summary Judgment (Doc. 54) will be denied. A separate Order will issue.

Robert D. Mariani
United States District Judge

---

[5] Standing alone, the deposition testimony of Santarelli, McClure-Roberts, and Sheppard, as to the telephone calls made to them by Senator Hughes, together with the absence of any recollection on the part of Senator Hughes as to having made these specific calls, would not aid Savage in establishing the existence of a genuine dispute of fact for trial on his political discrimination/retaliation claim. This is so because while the substance of the calls in question show political animus towards Savage by Hughes and his support for Tartaglione, such substance does not present evidence linking the phone calls to the Commission or its resign-to-run policy. However, because this Court has found that genuine disputes of fact exist as to why the Commission enacted the resign-to-run rule, and, more specifically, why the prohibition on running for office was proposed for the first time on November 1, 2013, some seven days after the Savage fundraiser at The Palms restaurant, hosted by Santarelli, McClure-Roberts, and Sheppard, this Court cannot say that Senator Hughes' active opposition to Savage and his alleged efforts to dissuade these fundraising supporters from continuing their efforts on Savage's behalf, has no relevance to the issues that will be tried.